MABEL C. HARRIS, Petitioner v.. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harris v. Commissioner
Docket No. 5087-67
United States Tax Court
T.C. Memo 1973-150; 1973 Tax Ct. Memo LEXIS 138; 32 T.C.M. (CCH) 718; T.C.M. (RIA) 73150; July 9, 1973, Filed. Roger L. Davis, for the petitioner. Richard G. Holloway, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: [1] Respondent determined deficiencies in petitioner's Federal income taxes as follows: Year
Deficiency 1963
$ 5,725.00
1964
18,055.82
1965
8,210.81
TOTAL
$31,991.63
*141 2 Petitioner claimed in her petition that she made overpayments in her Federal income taxes as follows: Year
Overpayment 1963
$13,438.16
1964
9,108.89
1965
451.93
TOTAL
$22,998.98
The following losses claimed on petitioner's returns are in issue in this case: [2] Entity
Type of loss claimed
Amount 1963
1. Car Wax of America, Inc.
Worthless stock - short term capital loss
$22,900
1964
2. J. L. Kane
Bad debt - short term capital loss
5,200
3. Mitchell Topal
Bad debt - short term capital loss
7,210
4. Roda Airways
Bad debt - short term capital loss
5,000
5. McConnell Enterprise
Bad debt - short term capital loss
20,000
6. Mitchell Werbell
Bad debt - short term capital loss
4,500
1965
7. Grant Dick
Bad debt - short term capital loss
5,150
8. Dan Alamprese
Bad debt - short term capital loss
3,500
9.Laximp
Worthless stock - long term capital loss
13,203
10. Danco
Bad debt - short term capital loss
3,000
11. Crest Conversion
Bad debt - short term capital loss
2,000
12. Tropical Film
Worthless stock - long term capital loss
4,000
*142 The following itemized deductions claimed as miscellaneous expenses on petitioner's returns are also in issue in this case: 1964 Category of Expense Claimed
Amount Legal
$ 700.00
Telephone
1,171.91
Travel and Transportation
8,005,72
1965
Telephone
3,421.28
Travel
13,219.34
In addition, in her petition petitioner claims she is entitled to deduct business expenses not claimed on petitioner's returns, for the years 1963, 1964 and 1965 in the amounts of $50,000, $40,000 and $40,000, respectively. The questions to be decided are the following: 1. Is petitioner entitled to the contested capital losses claimed as such on her 1963, 1964 and 1965 returns? [3]
2. Are any of those claimed amounts which are not deductible as capital losses deductible instead, as variously 4 alleged, as (a) business expenses, [4] (b) expenses incurred in transactions entered into for profit, *143 [5] (c) business losses, [6] (d) losses incurred in a transaction entered into for profit, [7] (e) business bad debts, [8] (f) payments as a guarantor of noncorporate obligations the proceeds of which were used in the trade or business of the borrower [9] or (g) payments as a guarantor of the nonbusiness debts of others, i.e., nonbusiness bad debt? [10]
3. Is petitioner entitled to deduct, as either business expenses or expenses incurred in transactions entered into for profit, any or all of the contested itemized deductions claimed on her 1964 and 1965 returns? 4. Is petitioner entitled to deduct as either business expenses or expenses incurred in transactions entered into for profit for the years 1963, 1964 and 1965 any part or all of the additional amounts of $50,000, $40,000 and $40,000, respectively, claimed in the petition? FINDINGS OF FACT Some of the facts have been stipulated and are so found. 5 Petitioner was a resident of Fort Lauderdale, Florida at the time she filed her petition in this case. She *144 filed her Federal income tax returns for 1963, 1964 and 1965 with the district director in Jacksonville, Florida. Petitioner was born in 1902. She is the widow of two husbands, Evan McConnell who died in 1949, and Robert L. Harris who died in 1960. During the years in issue, 1963, 1964 and 1965, petitioner maintained her residence in Fort Lauderdale, Florida, and a summer home in Atlanta, Georgia. During 1963, 1964 and 1965 petitioner was not engaged in any trade or business. She was not licensed by either the State of Florida or Georgia to carry on a small loan business, she did not hold herself out to the public as being in the business of making loans, and she was not a promoter of corporations. Her only substantial economic activity was managing the investments left to her by her first husband, Evan McConnell. On her 1963, 1964 and 1965 Federal income tax returns petitioner listed her occupation as "Investor." Petitioner's 1963 Federal income tax return was prepared by a certified public accounting firm in Atlanta, Georgia. Her 1964 and 1965 Federal income tax returns were prepared by a certified public accountant in Fort Lauderdale, Florida. Petitioner did not claim *145 any deductions for business losses or business bad debts on her 1963, 1964 or 1965 returns. She was aware that no such business losses or business bad debts were 6 claimed on those returns since she supplied the accountants with the information needed for the preparation of the returns, and she received and signed each return before filing it. In 1966, however, when the Internal Revenue Service began an audit of petitioner's returns, her attorney advised her that in his opinion she and her son had been, during the years in issue, doing business together through Samuel E. McConnell Enterprise, Inc., and therefore very substantial business deductions should have been taken for the years in issue. Samuel Evan McConnell (hereinafter "Sam"), petitioner's only child, was born in 1928 in Atlanta, Georgia. He attended Georgia Tech University for a year and a half and in 1949, when his father become ill, Sam quit school to work in the Roswell Company, the family textile manufacturing business. Sam owned no common stock in this company, but only debentures and preferred stock. Sam was an employee of the Roswell Company until August 1961, when the business was sold. Sam and petitioner *146 each received a portion of the proceeds from the sale of the Roswell Company. Petitioner gave her share of the sale proceeds to Sam and paid a gift tax thereon. After the Roswell Company was sold in August 1961, Sam became and remained unemployed. In 1962 he moved from Atlanta to Fort Lauderdale. During the years 1962 through 1965 Sam resided with petitioner in her homes in both Atlanta and Fort Lauderdale. 7 Sam's father, Evan McConnell, was one of the organizers of Southern Waistbands, a corporation which manufactured waistbands for men's trousers. He bequeathed his Southern Waistband stock to petitioner and Sam. During the year in issue, Sam's income consisted almost entirely of dividends from Southern Waistbands and money petitioner gave to him. All the people to whom petitioner paid money, as noted below (except Sam), were Sam's friends. Petitioner regards Sam as a very gullible person. He never investigated his friends or their businesses before becoming involved with them. Sam understands "profits" to be synonymous with "receipts." In any event, none of the transactions described below produced either "profits" or "receipts" for Sam or petitioner. A. *147 EXPENSES DEDUCTED IN 1964 AND 1965 RETURNS. 1. Legal. In 1964 petitioner paid $753.88, allegedly for legal services, and deducted $700 of that amount without explaination on her return as a "miscellaneous deduction." This included the following items: (a) on January 28, 1964 she paid Bob Biewend $300 for legal services; (b) on July 7, 1964 she paid the law firm of Davis, Fogan & McConnaughey $200 for legal services; (c) on September 15, 1964 she paid Florida Power and Light Company $53.88 on behalf of Biewend for legal services Biewend rendered to her; (d) on July 26, 1964 she paid Sam $200 8 so that he could pay for legal services rendered to him. The $200 was deposited in Sam's account. Petitioner does not remember and produced no evidence regarding the nature of the legal services performed by either Biewend or the Davis firm. The legal services were personal in nature. 2. Telephone. Petitioner maintained telephones in both her Fort Lauderdale and Atlanta homes. She also paid the telephone bills on two other telephones, but she does not remember where these telephones were located or in whose name they were registered. In addition, petitioner paid the telephone *148 bills for a telephone installed in the office of Samuel E. McConnell Enterprise, Inc., and registered in Sam's name. Many long distance calls were made on these five telephones, but petitioner did not know, and introduced no evidence indicating, who made the calls, to whom they were made, or what was the purpose thereof. She deducted 60% of these telephone bills in 1964 and 1965. The calls were personal in nature. 3. Travel and Transportation. Sam, his friends and, occasionally, petitioner flew frequently over most of the United States, the Caribbean and parts of South America in airplanes purchased with petitioner's money and flown by a crew paid with petitioner's money. The planes would usually be filled for such trips. Petitioner could not recall, and produced no credible evidence indicating, the 9 dates these trips were made or the purpose for the trips. These flights were for personal travel; none of them were business trips or trips incurred in connection with transactions entered into for profits. B. CAPITAL LOSSES CLAIMED ON 1963, 1964 AND 1965 RETURNS. 1. Car Wax of America, Inc. On her 1963 return petitioner claimed a $22,900 deduction from the worthlessness *149 of Car Wax of America, Inc., ("Wax") stock. Wax was a Georgia corporation which entered into the business of washing and waxing automobiles in Atlanta in 1962. Mitchell Topal was president and Joe Kane was vice-president and secretary. Both were Sam's friends. Petitioner was never actively involved with Wax in any manner. She was not an officer or director. She never received any money from the company. Petitioner never paid any sum for any Wax stock and she never received any stock certificate or any other evidence of ownership of stock. Petitioner was not a stockholder of Wax and incurred no loss for worthlessness of Wax stock. Petitioner did not prove any payment of $22,900 or any other amount to Wax. Petitioner did not pay $22,900 or any other sum to Wax as a loan or for any other purpose. 2. J. L. Kane. On her 1964 return petitioner claimed a $5,200 nonbusiness bad debt deduction for a loan to Joe Kane. 10 In June 1962 petitioner received a telephone call from Kane and Topal in which they alleged to her that an Internal Revenue Service agent was at their office and would arrest them if they failed to pay their personal Federal income taxes. As a result *150 of this conversation, petitioner issued her personal check in the amount of $5,200 to Kane on June 30, 1962, "to keep them out of jail." The $5,200 check payable to Kane was deposited to the account of J. L. Kane Associates, a company with which petitioner had no connection. This money was used for Kane's personal expenses. Petitioner never requested or received any security for this payment, nor did she charge any interest or establish any maturity date. Neither Kane nor Topal ever repaid the $5,200 to petitioner. Petitioner took no legal action to enforce collection of this payment. There was no reasonable expectation at the time the check was delivered to Kane that he would ever repay it. Petitioner's $5,200 payment to Kane was not a loan. 3. Mitchell Topal. On her 1964 return petitioner claimed a $7,210 nonbusiness bad debt deduction for a loan to Mitchell Topal. Petitioner made the following payments to or on behalf of Topal in 1962, 1963 and 1964: 11 Date
Payee
Amount (a) July 6, 1962
Mitchell Topal
$1,300.00
(b) September 25, 1962
B. J. Mimms
250.00
(c) October 1, 1962
Mitchell Topal
2,500.00
(d) December 3, 1962
Mitchell Topal
210.00
(e) December 18, 1962
Mitchell Topal
500.00
(f) January 28, 1963
Ford Motor Credit Co.
194.10
February 23, 1963
Ford Motor Credit Co.
194.19
March 15, 1963
Ford Motor Credit Co.
194.10
April 16, 1963
Ford Motor Credit Co.
194.10
May 7, 1963
Ford Motor Credit Co.
194.10
May 28, 1963
Ford Motor Credit Co.
194.10
June 25, 1963
Ford Motor Credit Co.
194.10
July 26, 1963
Ford Motor Credit Co.
194.10
September 3, 1963
Ford Motor Credit Co.
194.10
September 11, 1963
Ford Motor Credit Co.
194.19
October 15, 1963
Ford Motor Credit Co.
194.19
November 10, 1963
Ford Motor Credit Co.
194.19
December 10, 1963
Ford Motor Credit Co.
194.19
January 10, 1964
Ford Motor Credit Co.
194.19
(g) November 13, 1962
Mitchell Topal
50.00
TOTAL
$7,527.94
*151 (a) The $1,300 petitioner gave Topal on July 6, 1962 was for his personal use. In exchange for petitioner's certified check for $1,300, petitioner took Topal's check postdated 12 August 1, 1962 in the amount of $1,540. Petitioner never deposited this check because she had learned that Topal did not have an account at the bank upon which the check was drawn. The $1,300 payment to Topal was not a loan. There was no reasonable expectation on July 6, 1962 that Topal would pay the $1,540. (b) On September 25, 1962, Topal borrowed $250 for his personal use from petitioner's friend B. J. Mimms. Petitioner did not authorize B. J. Mimms to advance $250 to Topal on her behalf. Petitioner eventually repaid this sum to B. J. Mimms by deducting that amount from monies B. J. Mimms owed her. The $250 payment made by petitioner on behalf of Topal was not a loan.There was never any reasonable expectation that it would be repaid. (c) Topal, on behalf of Wax, executed a Georgia conditional sales contract with Pugmire Lincoln-Mercury, Inc. of Atlanta on August 31, 1962 for the installment purchase of a new 1962 Lincoln Continental. Petitioner signed the contract as a guarantor. The contract *152 called for 36 equal monthly payments of $194.19 each beginning October 10, 1962. The purchase price was $7,672.75 less the trade-in value of a 1962 Thunderbird allegedly owned by Topal. The Lincoln Continental was purchased for Topal's personal use and not for the business of Wax. Petitioner gave Topal $2,500 on October 1, 1962 for his personal use. The Trust Company of Georgia, petitioner's 13 Atlanta bank, issued three cashier checks to petitioner in the amounts of $500, $1,000 and $1,000. Petitioner endorsed those checks to Topal, who cashed them. The $2,500 was not for the business of Wax or for payment on the automobile. The $2,500 was not a loan by petitioner to Topal. There was never any reasonable expectation of repayment. (d) On December 3, 1962 petitioner issued a $210 check payable to cash and delivered it to Topal. Topal used this money for a personal trip. The $210 was not a loan by petitioner to Topal. There was never any reasonable expectation that Topal would repay the $210. (e) On December 18, 1962, petitioner gave $500 to Topal for his personal use. The $500 was not a loan by petitioner to Topal. There was never any reasonable expectation of repayment.
*153 (f) Pugmire Lincoln-Mercury assigned the conditional sales contract on the Lincoln Continental to Ford Motor Credit Company. In 1963, as guarantor, petitioner made five payments of $194.19 and eight payments of $194.10 to Ford Motor Credit Company, for total payments in 1963 of $2,523.75. A final payment of $194.19 was made on January 10, 1964. During this time petitioner never requested Topal to make any payment on the automobile and she never asked him to give the automobile to her. The payments petitioner made on the automobile were not loans by petitioner to Topal. There was never any reasonable expectation Topal would repay these amounts. 14 (g) On November 13, 1962 Topal wrote a $50 check to cash which petitioner endorsed and cashed for him. The check was for pocket money for Topal. This $50 check was dishonored upon presentment and petitioner had to make it good. The $50 was not a loan by petitioner to Topal. There was never any reasonable expectation it would be repaid. Petitioner appeared before a grand jury in Atlanta in March 1964 to testify against Topal, who had allegedly broken into her house and taken her mink coat to pay a gambling debt. Petitioner *154 last saw Topal in January 1964 in Fort Lauderdale when he brought her a pawn ticket for a diamond pin he had allegedly stolen from her and pawned. Petitioner never requested or received any security for any of the payments she made to or on behalf of Topal; no notes or other evidences of indebtedness ever existed; no interest was charged; no maturity dates were established; no formal legal action to collect was ever instituted against Topal; no demand was made for return of the automobile; petitioner never levied against the automobile; and petitioner never intended, expected, or had any reason to expect to be repaid any of the sums she gave Topal. Petitioner paid to or on behalf of Topal $4,810 in 1962, $2,523.75 in 1963 and $194.19 in 1964, a total of $7,527.94. None of these amounts petitioner paid to or on behalf of Topal was for the business of Wax. All of the payments made by 15 petitioner to or on behalf of Topal were for his personal use and were not loans. 4. Roda Airways. On her 1964 return petitioner claimed a $5,000 nonbusiness bad debt deduction for a loan to Roda Airways. Roda Airways was an import-export business which hauled milk and produce between *155 San Juan, Puerto Rico and the Virgin Islands, and between the United States and points in Haiti, Guatemala and the Bahamas. Roda Airways was a sole proprietorship owned and operated by Bob Roberson, one of Sam's friends. Roda Airways never owned any airplanes. The airplanes it used to haul the milk and produce, a twin-engine cargo plane and twin-engine executive plane, were owned by Donaldson and Son and leased to Roda Airways. Shortly after Sam met Roberson, Sam purchased the cargo plane for apprxoimately $20,000 and the executive plane for approximately $24,000 with money petitioner gave him. Title to the airplanes wad placed in the name of Samuel E. McConnell Enterprise, Inc. ("Enterprise"). Sam had control over the use of the airplanes. Those two airplanes, along with other airplanes Enterprise eventually acquired with money supplied by petitioner, were used entirely for pleasure trips and never for business purposes. Petitioner never received any money from Roda Airways. Roda Airways was discontinued and abandoned in 1963. Petitioner never advanced any money to Roda Airways, and she never 16 received any evidence of indebtedness, or any stock or other evidence *156 of ownership in Roda Airways. 5. McConnell Enterprise. Petitioner claimed a $20,000 nonbusiness bad debt deduction on her 1964 return with regard to Samuel E. McConnell Enterprise, Inc. ("Enterprise"). In the latter part of 1962, Sam established Enterprise. Enterprise was never incorporated, but was a sole proprietorship through which Sam could carry on his various activities. Enterprise leased an office at 939 North Atlantic Boulevard, Ford Lauderdale from July 1962 until 1965. A telephone was installed in that office in Sam's name. Petitioner paid all amounts billed to this telephone, and deducted 60% thereof. This office was merely a mailbox drop and a place where Sam could spend some of his time. Enterprise opened a bank account in 1962 which was closed in 1963. The bank account was used as a conduit for petitioner to pay Sam's personal expenses and obligations. Enterprise maintained some books and records at the beginning of its operations, but maintained no books or records of any kind after February 1963. Petitioner and Sam never had any written agreement between them regarding any financial activities, including any activities involving Enterprise. *157 Enterprise was not a partnership and did not file a Federal partnership return. 17 Neither petitioner nor Sam filed a Schedule C showing business carried on in Enterprise's name or any other name which would indicate that they were doing business separately or together. Petitioner never performed any duties for Enterprise other than to act as a source of funds for Sam. Petitioner and Sam were not partners and were not in business together. Petitioner's only records regarding her activities with Sam were her checkbooks. Petitioner never asked for or received an accounting from Sam regarding funds paid to or for him or Enterprise. She never requested or received any security or collateral from Sam or Enterprise for money she paid to or for him or Enterprise, she never charged interest, and she never established a maturity date. Neither Sam nor Enterprise ever repaid any money to petitioner. During 1963, 1964 and 1965 petitioner frequently advanced large sums of money to Sam to be used by him in any manner he desired. On May 20, 1963 petitioner deposited into her checking account a $9,000 dividend check which she had received from Southern Waistbands. The same day she *158 issued a $9,000 check to Sam marked "loan for business." This $9,000 payment to Sam was neither a business nor a personal loan. Some of the funds paid by petitioner to Sam or Enterprise were used by Sam for his personal living expenses. Petitioner had a Carte Blanche credit card issued to Sam on which 18 petitioner remained obligated. Petitioner also furnished Sam with an American Express credit card in his name on which she remained obligated. Petitioner paid all charges Sam incurred on his Carte Blanche and American Express credit cards either by making payments directly to those entities or to Sam for his disbursement. All such charges were incurred by Sam for his personal use. In 1963 petitioner issued 22 checks payable to or for Sam in the sum of $11,092.19. Each of those checks was either cashed by Sam, deposited by him to his personal account or used by him to pay bills he had incurred. These funds were paid by petitioner to Sam for his personal living expenses and were unrelated to any business activity. On July 26, 1964 petitioner issued a $200 check to Sam to pay an attorney's fee Sam had incurred. Petitioner deducted this amount on her return, as indicated *159 above, as a legal fee. Sam deposited the check to his personal account. This sum was also for Sam's personal activities. Petitioner never refused to pay any amount Sam requested, either personally or in connection with Enterprise. She continued to pay money to Enterprise even after she had written off $20,000 as bad debts in 1964 and even though she did not expect or intend to recoup those payments. Enterprise continued in existence until 1971. All of the payments petitioner made to or for Sam and Enterprise were for Sam's personal use. 19 Petitioner made funds available to Sam because of their close family relationship. Sam had, as petitioner was aware, no means to repay her the amounts she gave him. The amounts petitioner paid Sam during the years in issue were not loans. 6. Mitchell Werbell. Petitioner claimed a $4,500 nonbusiness bad debt deduction on her 1964 return with regard to Mitchell Werbell. Werbell was in public relations and advertising promotion, and was one of Sam's friends. He did the advertising for Wax. On April 17, 1962 petitioner, as co-maker with Werbell, executed a monthly repayment loan agreement, payable to the Trust Company of Georgia *160 in 24 equal monthly installments of $210 each, the first payment due on May 16, 1962. The principle amount of the loan was $4,500 and the total interest was $540. Security for this agreement was to be a 1961 Chris Craft boat owned by Werbell, but subject to a prior mortgage held by the Bank of Miami Beach. Although Werbell had allegedly agreed with petitioner to make the payments under the agreement, in fact petitioner made all 24 payments when due. Petitioner paid $1,680 in 1962, $2,520 in 1963 and $840 in 1964, for a total of $5,040. There is no evidence what Werbell did with the $4,500. Petitioner received nothing from Werbell for co-signing the loan agreement. The boat was eventually foreclosed on by the 20 prior lien holder. Petitioner never collected any money from Werbell regarding this agreement nor did she receive the boat. Petitioner never brought any legal proceedings against Werbell to enforce payment under this agreement. At the time the loan was made to Werbell there was no reasonable expectation he would repay it. 7. Grant Dick. Petitioner claimed a $5,150 nonbusiness bad debt deduction on her 1965 return with regard to Grant Dick ("Dick"). *161 Dick was employed by petitioner or Sam or Enterprise as an airplane pilot from sometime in 1964 until May 15, 1965. In the summer of 1965, while no longer an employee of petitioner, Sam or Enterprise, Dick asked petitioner to co-sign a $5,000 bank loan. As security for this loan petitioner was to receive a mortgage on a mobile home and lot owned by Dick and his wife as tenants by the entirety. Petitioner co-signed for the loan in September 1965, but Dick never delivered the mortgage. There is no evidence regarding what Dick used this money for. Dick never made any payments on this advance. At her request, petitioner's Fort Lauderdale National Bank account was charged $5,150 on December 8, 1965, in satisfaction of her and Dick's obligation. The $5,150 included $5,000 principle and $150 interest. In 1966 petitioner discussed collection of this money 21 with an attorney who informed her that Dick had a $5,000 household [sic] exemption and, therefore, in his opinion, Dick was judgment proof. Petitioner never brought any legal proceedings against Dick for the payment of this money. On April 8, 1971, petitioner saw Dick and requested that he repay this money to her. *162 Petitioner never collected any money from Dick. At the time the loan was made to Dick there was no reasonable expectation that he would be able or willing to repay it. 8. Dan Alamprese. Petitioner claimed a $3,500 nonbusiness bad debt deduction on her 1965 return with regard to Dan Alamprese. Sam first met Alamprese in February 1964 on San Andres Island where Alamprese was connected with a gambling casino.Alamprese was also involved in the Crest Conversion, Danco and Laximp "matters," as set forth infra. Sam introduced all of the people concerned with these transactions to petitioner. On December 21, 1964 petitioner issued her personal check to Alamprese for $3,500, interest free if repaid within one week, interest to be charged thereafter. The $3,500 was for his personal use. Sometime after this check cleared her account and was returned to her, petitioner marked in the check margin the word "loan." The check was endorsed in the United States by both Alamprese and his girl 22 friend. Petitioner never asked for or received any security for this advance. Alamprese never reapid any part of this amount to petitioner. Petitioner last saw Alamprese on January 29, 1966. *163 As of the time of trial, petitioner had not brought any legal proceedings against Alamprese to collect this money. At the time petitioner paid Alamprese the $3,500 there was no reasonable expectation he would repay it. 9. Laximp. Petitioner deducted $13,203 on her 1965 return for worthlessness of Laximp stock. Laximp was to be a company organized in South America by Bill Williamson, Alamprese, Tony Escobar (a citizen of Colombia, South America), and petitioner for the manufacture of clothing and radio equipment and the importation of liqueurs and clothing from South America. Williamson, Alamprese and Escobar were all friends of Sam. Escobar was to manage Laximp from offices in Bogota and Medellin, Colombia, South America. Laximp was to use Enterprise's office in Fort Lauderdale for its United States headquarters. During his stateside stay, Escobar had proposed to petitioner that he, Williamson, Alamprese and petitioner each place $10,000 into a corporation to be known as "Laximp." On January 11, 1965, petitioner gave telephone authorization to her Atlanta bank to issue its treasurer's check in the 23 amount of $10,000 and apply it against her account. The payee *164 was not designated. This $10,000 was not paid for Laximp stock. Laximp was never incorporated, it opened no offices, performed no business function and produced no income. Escobar, Williamson and Alamprese never placed any money into the proposed corporation. Petitioner never paid for Laximp stock and she never received any stock certificate or any other evidence of ownership. On March 3, 1965, petitioner issued a $270.30 check to Tony Escobar which she listed on her 1965 return as a medical expense payment. This $270.30 was for out-of-pocket expenses incurred by Escobar on a personal trip to South America and was for his personal use. 10. Danco. Petitioner deducted $3,000 on her 1965 return as a nonbusiness bad debt with regard to Danco. Danco was to be a company organized by Alamprese and Sol Covin (another of Sam's friends) to sell books and encyclopedias to soldiers on the army base in San Antonio, Texas. Alamprese and Covin were to be the officers in Danco, and the stockholders were to be Alamprese, Covin, Sam and petitioner. Danco was never incorporated and no stock was ever issued. It never had an office, but rater was first "operated" from a hotel room *165 and later from Alamprese's apartment. Danco never existed. 24 On May 14, 1965 petitioner issued her $1,000 personal check payable to Enterprise. This check cleared her account with the endorsement, "Sam McConnell Enterprise, Inc., Danny Alamprese, Crest Conversion, Inc., John T. Jennings, Pres." None of the signatures was in Sam's handwriting. On June 1, 1965 petitioner issued her personal check to Sam for $2,000 and endorsed it for deposit only. This check was deposited by Sam in his personal bank account. The $1,000 paid by petitioner to Enterprise and the $2,000 paid by petitioner to Sam were for his personal use. Petitioner never advanced any money to Danco and she never received any stock or bonds or any other evidence of ownership or indebtedness from Danco. 11. Crest Conversion. Petitioner deducted $2,000 on her 1965 return as a nonbusiness bad debt with regard to Crest Conversion. Crest Conversaion was a Texas corporation with its principal office in San Antonio, Texas. It was engaged in the business of converting military airplanes into privately owned and operated airplanes. John T. Jennings (another of Sam's friends) was president and Alamprese *166 and Covin were officers of Crest Conversion. On June 18, 1965 petitioner issued her personal check to Sam for $2,500, and endorsed it for deposit to Sam's 25 account. He deposited this check into his personal checking account. On June 18, 1965 Sam issued his personal check payable to Crest Conversion, Inc., for $2,000. There was no connection between the two checks. The $2,500 paid by petitioner to Sam was for his personal use. Petitioner never paid any money to Crest Conversion and she never received any stock or bonds or any other evidence of ownership or indebtedness from Crest Conversion. 12. Tropical Film. Petitioner deducted $4,000 on her 1965 return as a loss from worthlessness of stock of Tropical Film Productions, Inc., (hereinafter "Tropical Film"). Tropical Film was incorporated in Florida in 1964 for the purpose of making movies in Colombia, South America. Prior to the formation of Tropical Film, Sam entered into an "Agreement to Incorporate" on January 11, 1964 with Juliet Bridgman, Harry Donahue and H. C. Matthews (all friends of Sam) which called for the formation of Tropical Film. Sam was to receive 20% of the outstanding common stock; Sam was *167 to permit the corporation to use a Lockheed Lodestar executive aircraft owned by Enterprise (to be valued at $2,100 consideration); Sam was to lend $4,000 to the corporation to be paid to Roger L. Davis as trustee; and Sam was to be first vice president and a director. All of the parties signed this agreement except Juliet Bridgman. 26 This contract referred only to Sam and made no mention of petitioner. Petitioner was not a party to this agreement. Tropical Film was formed pursuant to the agreement, stock was issued and Sam became an officer and shareholder. On January 10, 1964, one day prior to the signing of the "Agreement to Incorporate," petitioner issued her personal check for $4,000 to Tropical Film Productions, Inc. The check cleared her account and was endorsed, "For deposit only, Tropical Film Productions, Inc." Petitioner did not receive any stock or bonds, or any other evidence of ownership or indebtedness for this payment. Petitioner had no legal relationship with Tropical Film. Sam, however, was required to furnish Tropical Film $4,000 cash and the use of the airplane. The $4,000 paid by petitioner to Tropical Film was on behalf of and in satisfaction *168 of Sam's obligation. C. ADDITIONAL DEDUCTIONS CLAIMED IN PETITION. In her petition, petitioner claimed deductions of $50,000, $40,000 and $40,000 for 1963, 1964 and 1965, respectively, as business expenses, namely telephone expenses, travel and transportation expenses, and promotion and entertainment expenses. None of these amounts was claimed by petitioner on her tax returns and none was disallowed by respondent in the notice of deficiency. 27 On brief, petitioner for the first time broke down the lump sum deductions claimed in her petition into approximately 26 separate items, and claimed that she was, alternatively, entitled to these deductions as business expenses, business losses, losses incurred in transactions entered into for profit, business bad debts or nonbusiness bad debts. The following is a list of 26 of those separate items together with the year in which claimed, as presented in petitioner's proposed findings of fact and brief: Item
Year Claimed
Amount Claimed 1. Lee Upsom
1963 or 1964
$3,000
2. Jack Topal
1964
650
3. Frost Free Groves
1963 or 1964
15,000
4. Wayne Davidson
1964
10,000
5. Liqueur business
1964 or 1965
2,000
6. Car Wax of Florida
1964
2,000
7. Communications International
unknown
unkown
8. Butler Shoe Company
unknown
unknown
9. Haitian Pineapple
unknown
unknown
10. Orange deal
unknown
unknown
11. Hilton Inns
1962
unknown
12. McWhirter
unknown
unknown
13. Atlas Corporation
1963
unknown
14. U.S.S. Alabama
1963
unknown
15. Andros Island
1963
unknown
16. Litter Containers
1964
unknown
17. Sir Sidney Oakes
1964
unknown
18. Knockdown Furniture
1965
unknown
19. Medotel
1963
unknown
20. Caribbean Development Corp.
1964
unknown
21. Second South American trip
1964
unknown
22. Third South American trip
1965
unknown
23. Compac Chemical
1965
unknown
24. Airplanes
1963-1965
unknown
25. Mario Coli
unknown
unknown
26. Airplane Charter
unknown
unknown
*169 In the case of 20 specific deductions, petitioner has failed to prove the amount, if any, allegedly expended. We therefore find as a fact that in the case of each of those 20 deductions, no amount was expended. We shall consider the remaining 6 deductions separately. 1. Lee Upsom. On brief, petitioner claimed a $3,000 deduction in 1963 or 1964 as a business loss, a loss incurred in a transaction entered into for profit, a business bad debt or a nonbusiness bad debt, with regard to Lee Upsom. 29 Upsom was in the sewage business in Orlando, Florida, and was one of Sam's friends. On June 11, 1962, petitioner issued her personal check to Upsom for $3,000 in exchange for Upsom's check for $3,000. Thereafter, Upsom exchanged petitioner's personal check for a certified check issued by petitioner's bank. Upsom's $3,000 check was dishonored upon presentment. Petitioner never requested or received any security for this payment, nor did she charge interest or establish a maturity date. Petitioner did not receive any evidence of indebtedness for this payment. Petitioner never brought any legal proceedings against Upsom for payment of this money. Petitioner abandoned attempts *170 to collect this sum from Upsom in 1962. No reasonable expectation existed on June 11, 1962, that Upsom would repay the $3,000. The $3,000 payment to Upsom was not a loan, but was for his personal use. 2. Jack Topal. On brief, petitioner claimed a $650 deduction in 1964 as a business loan, a loss incurred in a transaction entered into for profit, a business bad debt or a nonbusiness bad debt with regard to Jack Topal. Jack Topal is the brother of Mitchell Topal. On November 28, 1962, petitioner issued a $650 check to Jack Topal drawn on the account of the Estate of Robert L. Harris. Robert L. Harris was petitioner's late husband and she was executrix of 30 his estate. Petitioner never reimbursed the estate for this sum from her own funds. The $650 payment to Jack Topal was made by the estate and not by petitioner. 3. Frost Free Groves. On brief, petitioner claimed a $15,000 deduction in 1963 or 1964 as a business expense, a loss incurred in a trade or business, or a loss incurred in a transaction entered into for profit with regard to Frost Free Groves. Frost Free Groves was to be a business in which land was to be purchased in Hendry County, Florida, orange *171 trees were to be planted and orange groves were then to be sold to investors. The business was to be operated by Mitchell Werbell, Richard Harvey and Sam, with Richard Harvey as president. On March 5, 1962, petitioner issued her personal check for $15,000 to Frost Free Groves, and gave the check to Sam who endorsed it, "For deposit only, Frost Free Groves, Inc., Sam McConnell, Pres." This $15,000 was not paid for Frost Free Groves stock. Frost Free Groves never incorporated; it opened no offices, maintained no books or records, performed no business function and produced no income. Frost Free Groves never acquired any land, planted any orange trees or sold any orange groves. Werbell and Harvey never placed any money into the proposed corporation. The $15,000 was paid to Sam for his personal use. 31 4. Wayne Davidson. On brief, petitioner claimed a $10,000 deduction in 1964 as a business expense, a loss incurred in a trade or business, a loss incurred in a transaction entered into for profit, or a business bad debt with regard to Wayne Davidson. Wayne Davidson was an interior designer. He owned and operated Wayne Davidson Associates, Inc., through which he conducted *172 his interior design business. On May 7, 1963 petitioner loaned Wayne Davidson individually $3,000. This sum was repaid in February 1964. In June 1963 petitioner paid $10,000 to Wayne Davidson Associates, Inc. Petitioner never requested or received any security for this payment, nor did she charge interest or establish a maturity date. Petitioner did not receive any stock or securities or any other evidence of ownership or indebtedness for this advance. The $10,000 was not repaid to petitioner. In July 1964 petitioner and Sam discussed collection of this money with an attorney who informed them that, in his opinion, the money had been paid to Wayne Davidson Associates, Inc. and not Wayne Davidson individually. Petitioner never brought any legal proceedings for payment of this money against either Wayne Davidson Associates, Inc., or Wayne Davidson. At the time the payment was made to Wayne Davidson Associates, Inc., petitioner had no reasonable expectation that the money would be repaid. 32 5. Liqueur business. On brief, petitioner claimed $2,000 in 1964 or 1965 as a business expense, a loss incurred in a trade or business, or a loss incurred in a transaction entered *173 into for profit with regard to a liqueur business. Tony Escobar discussed with petitioner and Sam the importation of liqueurs into the United States from South America. On December 27, 1964, petitioner issued her personal check to Sam for $2,000. This $2,000 was for Sam's personal use. Neither Sam nor petitioner ever imported liqueurs into the United States. 6. Car Wax of Florida. On brief, petitioner claimed $2,000 in 1964 as a business expense, a loss incurred in a trade or business, or a loss incurred in a transaction entered into for profit with regard to Car Wax of Florida. Car Wax of Florida was an attempt by Sam to enter the automobile washing and waxing business in Fort Lauderdale, Florida. This entity was separate and distinct from Car Wax of America, Inc., of Atlanta. Petitioner had no relationship with Car Wax of Florida. On March 20, 1964, petitioner issued her personal check for $2,000 to Car Wax of America, Inc. The $2,000 was not a loan to or equity investment in Car Wax of Florida. 33 OPINION Petitioner contends that she is entitled to deduct the contested items claimed as capital losses on her 1963, 1964 and 1965 returns as claimed, or that *174 in the alternative, she is entitled to deduct these amounts as business expenses, expenses incurred in a transaction entered into for profit, business losses, losses incurred in a transaction entered into for profit, business bad debts, as payments as a guarantor of noncorporate obligations the proceeds of which were used in the trade or business of the borrower, or as payments as a guarantor of the nonbusiness bad debts of others. In addition, petitioner contends she is entitled to deduct either as business expenses or expenses incurred in a transaction entered into for profit the various deductions itemized on her 1964 and 1965 returns as "miscellaneous deductions." Finally, petitioner contends that she is entitled to deduct additional amounts claimed in her petition for the years 1963, 1964 and 1965 as either business expenses or expenses incurred in a transaction entered into for profit. Respondent asserts that none of these amounts is deductible because petitioner has failed to establish that she is entitled to any deduction with respect thereto. We agree with respondent. Basically, petitioner, who has the burden of proof in this case, has failed to carry that burden. Petitioner *175 and 34 her son Sam testified for days, but their testimony was vague, confusing, inconclusive, lacking in credibility, and even contradictory. Petitioner introduced into evidence hundreds of checks, check stubs, receipts and other documents, often without indicating the claimed effect of the same on the issues to which they supposedly appertained. In effect, petitioner has dumped into the hands of the Court innumerable exhibits and has asked the Court to ferret out their meaning. There is no question that petitioner has paid out large sums of money, but we cannot find that petitioner has proved that any of these payments are deductible for income tax purposes. Petitioner has produced no books and records for herself or for any of the persons or businesses with whom she claims she dealt. Neither has she produced the testimony of any of the individuals with whom she dealt. We have only the selfserving testimony of petitioner and her son. Debts and Guaranties of Debts. We consider first petitioner's claim that she is entitled to deduct as short-term capital losses bad debts arising from the numerous nonbusiness loans made to her son and his friends. *176 To obtain these deductions petitioner must show that the debts were valid and not worthless at inception, that they had not become worthless before the beginning of the year in which claimed, and that they did 35 become worthless before the close of that year. See Russell Box Co. v. Commissioner, 208 F. 2d 452, 455-456 (C.A. 1, 1953), affirming a Memorandum Opinion of this Court. A bona fide debt "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Section 1.66-1(c), Income Tax Regs. No deduction may be taken for a loan made with no intention of enforcing payment ( C. B. Hayes, 17 B.T.A. 86 (1929)), or the repayment of which is contingent upon some event ( Zimmerman v. United States, 318 F. 2d 611 (C.A. 9, 1963); Lucia Chase Ewing, 20 T.C. 216 (1953), affirmed on another issue, 213 F. 2d 438 (C.A. 2, 1954); Evans Clark, 18 T.C. 780 (1952), affirmed per curiam 205 F. 2d 353 (C.A. 2, 1953)), or where there was no reasonable *177 expectation of repayment when the loan was made ( C.B. Hayes, supra ). Intra-family transactions are subject to rigid scrutiny and are particularly susceptible to a finding that the transfer was intended as a gift rather than a debt. Armand P. Bartos, 27 T.C. 1002 (1957); William Francis Mercil, 24 T.C. 1150 (1955); Estate of Carr V. Van Anda, 12 T.C. 1158 (1949), affirmed per curiam 192 F. 2d 391 (C.A. 2, 1951); C.B. Hayes, supra; Jacob Grossman, 9 B.T.A. 643 (1927). We have found that petitioner's payments made to or on 36 behalf of her son were not made with any expectation of repayment and were made because of the close family relationship between petitioner and her only son. Petitioner knew that Sam had no means to repay her. His sole source of income was interest and dividends from stock he inherited from his father, and his standard of living substantially exceeded this income. Furthermore, in this situation, as in the case of all other alleged loans made by petitioner and disallowed by respondent, there were no notes or other evidences of indebtedness, petitioner never *178 charged and never received any interest, and there was no unconditional obligation to pay a fixed sum of money at a definite time. Petitioner and Sam testified that their understanding was that petitioner was to pay all Sam's expenses, and if and when he earned any money, he would reimburse her. However, he never succeeded in putting together a successful venture. Sam did not have an unconditional obligation to repay petitioner. We find that none of the payments petitioner made to or on behalf of Sam were loans. The amounts petitioner paid to Joe Kane and Mitchell Topal were not valid loans in that petitioner has failed to show that such alleged loans were not worthless at the time the "debts" were created. The first sum paid Kane and Topal was in response to a telephone call in which they 37 claimed that an Internal Revenue agent was in their office and would arrest them if they did not quickly pay their Federal income taxes. After getting $5,200 from petitioner, Kane used the money not to pay taxes but for his personal use.Thereafter, Topal gave petitioner numerous bad checks, and allegedly stole her mink coat to pay a gambling debt and stole her diamond pin and pawned *179 it. A debt derives its value from the integrity, character, and financial responsibility of the borrower. [11] Petitioner has failed to show that Kane and Topal were not bad risks both financially and morally.
With respect to petitioner's alleged loans to Roda Airways, petitioner has failed to show that she ever made the alleged loan. We therefore need not and do not reach the question whether the alleged loans were valid. As for the alleged loan to Dan Alamprese, who was connected with a gambling casino, again petitioner has failed to prove that the "loan" was not worthless at the time it was made and that she had a reasonable expectation of being repaid. Here, as in the case of every other alleged loan, we have only the vague, inconclusive and self-serving testimony 38 of petitioner and her son. No alleged debtors were produced to testify in this case, and no notes or other written evidences of indebtedness were introduced into evidence. Petitioner has failed to sustain her burden of *180 proof that a valid debt ever existed. The amounts petitioner claimed she loaned to Danco, an unincorporated business of which Sam was to be a stockholder, were in fact gifts to Sam made in the form of checks payable to Sam or Samuel E. McConnell Enterprise, Inc. Likewise, the amount she claimed she loaned Crest Conversion, a Texas corporation, was also a gift to Sam made in the form of a check payable to Sam. Petitioner also claimed a nonbusiness bad debt deduction arising out of her guaranty (as co-maker) of a loan made by the Trust Company of Georgia to Mitchell Werbell. Payment on a guaranty is deductible as a bad debt if the claim for reimbursement against the principal obligor becomes worthless. Putnam v. Commissioner, 352 U.S. 82 (1956). But here again, no debt is created and no deduction is available to petitioner if there was no good prospect of repayment by the primary obligor at the time the guaranty was entered into. Hoyt v. Commissioner, 145 F. 2d 634 (C.A. 2, 1944), affirming a Memorandum Opinion of this Court; George B. Markle, Jr., 17 T.C. 1593 (1952); *181 E. J. Ellisberg, 9 T.C. 463 (1947). 39 Petitioner has failed to show that she had any reasonable expectation that Werbell could repay the note at the time he made the loan from the Trust Company of Georgia. Werbell put up his pleasure boat supposedly as security for the loan, but the boat was subject to a prior mortgage and was in fact foreclosed on by the prior lien holder. Petitioner made no investigation of Werbell to ascertain his financial condition. Furthermore, the repayment history of this loan indicates that when the loan was made, petitioner never expected Werbell to repay this obligation. Petitioner made each and every payment when due, beginning with the very first payment. The record does not indicate that petitioner ever requested Werbell to repay her, or that she ever brought any legal proceedings against Werbell to enforce repayment. Even if the loan to Werbell were not worthless from its inception, petitioner's failure to seek to collect from him, in the absence of evidence on whether such attempt would have been futile, would be enough to deny her the right to a bad debt deduction on the guaranty. Acheson v. Commissioner, 155 F. 2d 369 *182 (C.A. 5, 1946); Charles J. Matthews, 8 T.C. 1313 (1947). Finally, there is no evidence that Werbell used the proceeds of the loan in his business, if any; therefore petitioner is not entitled to a deduction under section 166(f) as a guarantor of a noncorporate obligation the 40 proceeds of which were used in the trade or business of the borrower. Petitioner also claimed a bad debt deduction arising out of her guaranty (as co-maker) of a bank loan to Grant Dick. Again petitioner has failed to show that the loan to Dick was not worthless when made. Petitioner paid off the entire loan in one lump sum within three months after it was made in order to avoid having the responsibility of making monthly payments on behalf of Dick. There is no evidence that petitioner ever expected Dick to repay his loan. Dick did not testify, although petitioner claims to have seem him shortly before trial. Petitioner is not entitled to a bad debt deduction in connection with her guaranty of Dick's laon, nor is she entitled to a deduction under section 166(f) inasmuch as there is no evidence that Dick used the proceeds of the loan in his business, if any. Petitioner also claimed *183 a bad debt deduction arising out of the conditional sales contract with Pugmire Lincoln-Mercury executed by Topal and guaranteed by petitioner. Petitioner has failed to show she had any reasonable expectation Topal would make the payments on the car. Petitioner made no effort to collect from Topal the amounts she paid on the car or to take possession of the car. Therefore, she is not entitled to a bad debt deduction on account of her guaranty of Topal's "debts." Finally, there is no evidence 41 that Topal used the car in his business, so petitioner also is not entitled to a deduction under section 166(f). Worthless Stock. Petitioner claimed deductions for losses arising from the alleged worthlessness of stock in three alleged corporations. To be entitled to a deduction for worthless stock, petitioner must first prove she owned such stock or stock rights. Boesel v. Commissioner, 208 F. 2d 817 (C.A. 2, 1954), affirming a Memorandum Opinion of this Court. See section 165(g) (1) and (2). On her 1965 return petitioner claimed a $4,000 long term capital loss from worthlessness of stock in Tropical Film. Pursuant to an agreement of January 11, 1964, Sam was *184 to contribute $4,000 to Tropical Film in return for which he was to become an officer, director and shareholder in that corporation. Petitioner was neither mentioned in this contract nor was she a party to it. Petitioner paid $4,000 to Tropical Film in satisfaction of her son's obligation under the contract. This $4,000 was a gift from petitioner to Sam. Petitioner never owned any stock in Tropical Film and therefore is not entitled to a deduction in connection with such stock. On her 1965 return petitioner claimed a $13,203 long term capital loss from worthlessness of stock in Laximp. On briefs she conceded that perhaps the amount deductible 42 should have been only $10,000. In the first place, however, Laximp was never incorporated. In the second place, petitioner proved only that she had had her bank issue a treasurer's check for $10,000 on January 11, 1965. She did not prove to whom the money was paid and for what purpose. Petitioner has not shown she was entitled to any deduction in connection with Laximp for worthless stock or any other reason. On her 1963 return petitioner claimed a $22,900 short term capital loss from worthless stock in Car Wax of America *185 ("Wax"). On briefs she conceded $7,900 of the claimed deduction. Petitioner has failed to persuade us that she owned any stock in Wax. Despite the inordinate amount of documentary and oral evidence petitioner has introduced in this case, the record is completely devoid of any evidence that petitioner ever paid any money for Wax stock. Therefore, petitioner is not entitled to the claimed deduction. Business Losses, Business Bad Debts and Business Expenses. To be entitled to a deduction for business losses, business bad debts and/or business expenses, petitioner must first show she was engaged in carrying on a trade or business. Section 162(a), 165(c) (1), and 166(a) and (d). We have found as a fact that petitioner was not engaged in any business, but, on the contrary, her only significant economic activity consisted of managing her inherited 43 investments. Noen of the losses or expenses in issue are connected with these investments. Therefore we find that none of the losses or expenses in issue were business losses, business bad debts or business expenses. As noted at the beginning *186 of this opinion, petitioner claimed business expenses of $50,000, $40,000 and $40,000 for 1963, 1964 and 1965, respectively, for the first time in her petition in this case. We have held that petitioner was not engaged in any business and therefore is not entitled to any business expenses for 1963, 1964 and 1965. However, in her brief petitioner contends that certain of these business expenses, if not business expenses, were instead losses or bad debts. These issues were not raised by the pleadings and petitioner has presented no motion to amend the pleadings. Petitioner may not raise new issues for the first time in her brief ( Sidney Messer, 52 T.C. 440, 455 (1969), affirmed on other issues 438 F. 2d 774 (C.A. 3, 1971); Frank Polk, 31 T.C. 412, 415 (1958), affirmed on other issues, 276 F. 2d 601 (C.A. 10, 1960); William Greenberg, 25 T.C. 534, 536-537 (1955)), and we will not consider those issues in this opinion. Losses and Expenses Incurred in Transactions Entered Into for Profit. An individual is entitled *187 to a deduction for losses incurred in any transaction entered into for profit, even 44 though not connected with a trade or business. Section 165(a) and (c) (2). However, there is no evidence in the record to sustain petitioner's claim that any amounts deducted on her 1963, 1964 and 1965 returns which are in issue here or any amounts claimed in her petition are allowable deductions for losses incurred in transactions entered into for profit. Petitioner deducted substantial amounts on her 1964 and 1965 returns for legal, telephone and travel expenses, and claimed additional substantial amounts for 1963, 1964 and 1965 in her peition, primarily for travel expenses. We have found that petitioner does not remember what legal services were rendered her by the various law firms to which she made payments. She has completely failed to prove that any of the legal fees were expenses incurred in a transaction entered into for profit. Likewise, in the case of the telephone bills, petitioner does not know who used the telephones or to whom the calls were placed. Again she has completely failed to prove that any of the telephone bills introduced in evidence represent expenses incurred *188 in a transaction entered into for profit. In the case of travel expenses, including the use of various airplanes purchased with petitioner's money, there 45 is no doubt petitioner expended substantial sums of money, but there is no evidence that any sums expended were in connection with a transaction entered into by her for profit. These sums appear to have been spent on personal pleasure trips taken by Sam and his friends, and occasionally, by petitioner. No logs were introduced for the various privately-owned airplanes. Petitioner constantly failed to establish the point of origin for the numerous flights by her various airplanes. Petitioner suggests she should be allowed deductions in connection with these airplanes on the basis of cost per hour of flight time, but there is no evidence of the number of hours flown nor the beginning and ending point of each flight. In addition, the record is wholly inadequate in terms of the substantiation required by section 274 and the regulations promulgated thereunder. Petitioner has failed to meet her burden of establishing that costs of any travel taken by herself, Sam and his friends, whether by commercial plane or in the airplanes *189 purchased with her money, or any hotel expenses incurred by any of them, are deductible expenses incurred in transactions she entered into for profit. Decision will be entered under Rule 50. Footnotes
1. Pursuant to a notice of reassignment sent to counsel for the parties, and to which no objections were filed, this case was reassigned by the Chief Judge on October 16, 1972, from Judge Craig S. Atkins to Judge Cynthia Holcomb Hall↩ for disposition. 2. Other adjustments determined for petitioner's years 1963, 1964 and 1965 have been resolved. ↩
3. The claimed capital losses were from worthlessness of stock (section 165(g)) and from nonbusiness bad debts (section 166(d) (1) (B)↩). All section references in this footnote and elsewhere are to the Internal Revenue Code of 1954, as in effect during the years in issue. 4. Section 162(a)↩. 5. Section 212. ↩
6. Section 165(c) (1)↩. 7. Section 165(c) (2)↩. 8. Section 166(a)↩. 9. Section 166(f)↩. 10. Section 166(d)↩. 11. Cf. Lester C. Bailey, CCH decision 18,367 (M), where the taxpayer made loans to an individual who had been indicted and arraigned for having obtained money under false pretenses. ↩