HENRY CROWN AND GLADYS K. CROWN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1588–77.     Filed September 17, 1981.

---

[6]See note 2 *supra.*
[7]See note 2 *supra.*

*Byron S. Miller, Alan L. Reinstein*, and *Geoffrey F. Grossman*, for the petitioners.

*Seymour I. Sherman*, for the respondent.

WILBUR, *Judge*: Respondent issued a statutory notice of deficiency on December 16, 1976, in which he determined deficiencies in petitioners' Federal income tax for their taxable years 1966 through 1969, as follows:

| Year | Deficiency |
| --- | --- |
| 1966 | $696,272.30 |
| 1967 | 255.74 |
| 1968 | 35,563.96 |
| 1969 | 2,022.87 |

The only issues remaining for our decision relate to the proper tax treatment of various transactions arising from petitioner Henry Crown's guarantee of an obligation of United Equity Corp. Specifically, petitioners allege that:

(1) Respondent erroneously failed to allow a nonbusiness bad debt deduction in the amount of $2,697,131.31 for calendar year 1966, as reported on petitioners' return for such year by reason of the worthlessness of the claim of Henry Crown against United Equity Corp. arising from petitioner's satisfaction, as coguarantor, of United Equity's indebtedness;

(2) Respondent erroneously included in petitioners' income as a short-term capital gain for calendar year 1968 the amount of $70,000 received by Henry Crown in satisfaction of his claim against his coguarantors of the United Equity indebtedness—such inclusion being impermissible without the allowance of the foregoing bad debt deduction; and

(3) Alternatively, respondent erroneously failed to allow petitioners for calendar year 1969 either a nonbusiness bad debt deduction with respect to the United Equity indebtedness in the amount of $2,627,131.31 or a long-term capital loss in

such amount by reason of Henry Crown's sale of all of his interests in claims and collateral assets connected with such indebtedness.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioners Henry and Gladys K. Crown, husband and wife, resided in Evanston, Ill., at the time the petition herein was filed. Petitioners are cash basis, calendar year taxpayers. They filed joint Federal income tax returns for the taxable years 1966 to 1969, inclusive, with the District Director of Internal Revenue at Chicago, Ill. Henry Crown was the actual participant in the transactions giving rise to the taxes and issues in controversy and, accordingly, he will hereinafter be referred to as petitioner.

During 1963 and thereafter, petitioner and his family were substantial stockholders of General Dynamics Corp. (hereinafter General Dynamics). General Dynamics had previously acquired Material Service Corp. from petitioner and his family. During 1963, petitioner was a director of General Dynamics; Patrick H. Hoy (hereinafter Hoy) was president of the Material Service Division of General Dynamics. Hoy was a principal shareholder of United Equity Corp. (hereinafter United Equity) which was, at all times here pertinent, a holding company whose only significant asset was a controlling interest in the stock of Insurance City Life Co. (hereinafter ICL), an insurance company organized under Connecticut law.

Prior to 1963, United Equity borrowed $1.6 million on a secured basis from the American National Bank & Trust Co. of Chicago (hereinafter American National). Such loan was guaranteed jointly and severally by Hoy and five other principal shareholders of United Equity: Jerome S. Garland, Frank W. Chesrow, Charles E. St. Louis, Barton A. Scheidt, and John B. Huarisa (hereinafter Huarisa).

On May 20, 1963, petitioner became a guarantor of the United Equity indebtedness owed to American National, then outstanding in the amount of $1,674,486 including accrued interest. Thereafter, from time to time, American National

renewed, extended, and increased its loan to United Equity. Petitioner, Hoy, and all of the other guarantors except Huarisa renewed, extended, and increased their guarantees correspondingly. Beginning in December 1963, Hoy and all of the other guarantors except Huarisa agreed in writing to indemnify petitioner against loss by reason of his guaranty. These indemnity agreements were renewed and extended from time to time as petitioner renewed or extended his guaranty of the United Equity indebtedness to American National.

On November 18, 1965, the Commissioner of Insurance of the State of Connecticut commenced proceedings seeking to prevent ICL from conducting further business. On November 19, 1965, American National requested that petitioner satisfy his guaranty of the United Equity indebtedness. Petitioner accordingly executed and delivered to American National his own 90-day note dated November 19, 1965, and due February 17, 1966, in favor of American National, in the amount of $2,697,131.31, the then-existing balance of the United Equity indebtedness, together with accrued interest. American National then transferred to petitioner its position as creditor of United Equity and as holder of the collateral securing the United Equity indebtedness (hereinafter the United Equity collateral). Such collateral consisted principally of 1,227,103 shares of ICL and shares of stock in two wholly owned ICL subsidiaries.

Petitioner executed renewal notes evidencing his American National indebtedness at 3-month intervals during 1966. The last renewal note executed in 1966 was a 90-day note dated November 14, 1966, and evidenced petitioner's promise to pay American National $2,697,131.31 with interest at the rate of 6 percent per annum, on February 13, 1967.

At first, petitioner's indebtedness to American National was unsecured; however, in September 1966, petitioner delivered to American National collateral consisting of stock in negotiable form, as security. American National valued this collateral at $2,967,422 in November 1966.

Petitioner was a personal friend of the two men who were the president and the chairman of the board of directors of American National during this period. While American National had substantial trust account business from petitioner

and his family, it eagerly sought to acquire part of the Crown family loan business.

During the period in question, the principal lending institution for the Crown family was the First National Bank of Chicago (hereinafter First National). Petitioner, various members of his family, and their enterprises had an informal line of credit at First National, in the amount of $50 million, supported by collateral and cross-guarantees. The credit was available generally to any one or more members of the related group of which petitioner was the acknowledged leader, with the collateral and guarantees of each member being applied by agreement to the loans of the other members. During 1965 and 1966, the balances reflecting petitioner's personal borrowing at First National ranged between a high of $7,250,000 on July 2, 1965, and a low of $3 million on June 29, 1966. For the period September 27, 1966, to December 30, 1966, petitioner's personal debt to First National was $3,296,252.96.

On December 30, 1966, petitioner borrowed an additional $2,697,131.31 from First National. This loan brought petitioner's indebtedness to First National to $5,993,384.27 and the entire family indebtedness, including petitioner's, owed to First National up to $11 million. The loan was evidenced by petitioner's note dated December 30, 1966, due March 1, 1967, in the amount of $2,697,131.31 with interest at the rate of 6 percent per annum.

Both American National and First National routinely prepare memoranda with respect to loans, and maintain such memoranda as part of their permanent loan files of record. A memorandum prepared by one of the bank officers at First National on January 3, 1967, concerning the loan transaction of December 30, 1966, reads as follows:

Robert Crown [petitioner's son] called on December 30 and presented a secured note of Henry Crown in the amount of $2,697.131.30 [sic] which we entered and then wired the proceeds through the Fed to the American National Bank, Chicago, with instructions to that bank to use the funds in full payment of Henry Crown's note due 12–30–66.

Bob advised me that arrangements for this loan were made by Henry over the telephone with Mr. Livingston [then chairman of the board of directors of First National]. Bob said that the note being paid at the American National Bank was the indebtedness Mr. Crown assumed at that bank under his guaranty of the Pat Hoy indebtedness there. He also said that the collateral lodged at the American National Bank included a substantial

amount of First National Bank stock and thus, he was not delivering the collateral American held to us but would lodge it in a safe deposit vault at the American National Bank until 3–1–67 when the American National has promised to loan the same amount to Henry Crown so that he may repay this loan to us. Rate 6%. This new loan brings Henry Crown's indebtedness to us up to $5,993,384.27.

The proceeds of this loan were applied against petitioner's November 14, 1966, note to American National.

On March 1, 1967, petitioner borrowed $3 million from American National. Part of the proceeds of this loan were applied in satisfaction of petitioner's December 30, 1966, note to First National. The remaining proceeds, as well as $250,235.75 from sources not revealed by the record, were used to reduce petitioner's outstanding loan balance at First National to $2,775,000. The loan records of both American National and First National contain memoranda relating to these transactions. The American National memorandum, dated February 28, 1967, provides:

Reported to the Loan Committee today, * * * , a $3,000,000 loan secured on approximately 100% advance against marketable securities. The repayment program is indefinite.

The First National memorandum, dated 3/1/67, provides:

Colonel Crown paid $3,218,000 of his personal indebtedness which matured today. As I understand it, these principal amounts represented the transfer to our bank of loans formerly carried at the American National Bank, Chicago, arising from Colonel Crown's picking up, under his guaranty, loans in the name of Patrick Hoy. According to my understanding, these notes have now been transferred back to the American National Bank as was the original understanding.

Petitioner issued a 90-day note dated March 1, 1967, in favor of American National evidencing his promise to pay on May 31, 1967, the amount of $3 million with interest at 5¾ percent per annum. The note states that it is secured by unlisted securities.

From time to time thereafter, petitioner issued new notes to American National renewing the indebtedness represented by his March 1, 1967, note. At no time thereafter did American National ever refuse a renewal or demand that petitioner liquidate his liability. During the years in question, petitioner made principal payments with respect to his March 1, 1967,

indebtedness to American National on the dates and in the amounts, as follows:

| Date | Amount of payment |
|---|---|
| June 13, 1967 | $100,000 |
| Dec. 29, 1967 | 50,000 |
| July 11, 1968 | 100,000 |
| Aug. 28, 1968 | 50,000 |

The greatest part of such indebtedness remained outstanding long after the taxable period in controversy. As of December 31, 1977, $1,950,000 remained outstanding.

In 1966, Hoy petitioned the Federal District Court for the Northern District of Illinois for relief under chapter XI of the Bankruptcy Act. Petitioner filed claims in that proceeding, including a $2,805,016.61 claim with respect to his guaranty of United Equity indebtedness and Hoy's related indemnity agreement, but received nothing in respect of such claims.

During 1967, United Equity was adjudicated bankrupt; it was ultimately dissolved, although the year of dissolution is not revealed in the record.

On January 8, 1968, petitioner collected, subject to escrow conditions, a total of $70,000 from three of his coguarantors of the United Equity indebtedness, in full settlement of their respective liabilities. Petitioner did not receive anything from the other three guarantors, who were either deceased, insolvent, or unable to be located.

Bankers Life & Casualty Co. (hereinafter Bankers) wished to acquire and realize on certain surplus deposit agreements issued by ICL. American Fletcher National Bank & Trust Co. of Indianapolis, Ind. (hereinafter American Fletcher), had loaned $1,200,000 to three of United Equity's principal shareholders (Hoy, Garland, and St. Louis) and held by assignment as collateral for the loan, ICL stock and two ICL surplus deposit agreements in an aggregate principal amount of $500,000. Petitioner, after satisfying his guarantor's liability to American National, had claims against United Equity and the coguarantors of the United Equity indebtedness to American National and he held ICL stock as collateral.

Petitioner had also guaranteed certain promissory notes of Hoy and William J. Holliday, Jr. (hereinafter Holliday), to First National in 1965. It appears that petitioner was called

upon to satisfy this guaranty in 1965, and, after doing so, he received as collateral a note dated June 14, 1965, in the amount of $500,000 from United Equity to the order of Hoy and Holliday and a $500,000 surplus deposit agreement of ICL issued to United Equity.

In order for Bankers to acquire and realize on the ICL surplus deposit agreements, on January 8, 1968, the following transactions and agreements were entered into:

(a) Bankers with American Fletcher (hereinafter the Bankers-American Fletcher agreement), pursuant to which Bankers agreed to pay American Fletcher $400,000 for American Fletcher's interests related to ICL.

(b) Bankers with General Dynamics (hereinafter the Bankers-General Dynamics agreement), pursuant to which General Dynamics agreed to reimburse Bankers for payment to American Fletcher pursuant to the Bankers-American Fletcher agreement under certain circumstances, particularly if Bankers should be unable to realize on the surplus deposit agreements. At this time, Hoy was employed as the president of the Material Service Division of General Dynamics.

(c) Hoy with General Dynamics, pursuant to which Hoy conditionally agreed to indemnify General Dynamics against loss by reason of the possible $400,000 reimbursement of Bankers under the Bankers-General Dynamics agreement.

(d) Petitioner with Bankers (hereinafter the Bankers-Crown agreement), pursuant to which petitioner transferred to Bankers his interests in the debts of United Equity to American National and of Hoy and Holliday to First National as well as the collateral securing those debts, in exchange for 126,667 shares of Royal American Industries, Inc. (hereinafter Royal American), then having an agreed value of $370,500. Under the Bankers-Crown agreement, Bankers obtained the right to foreclose on the collateral in complete satisfaction of the underlying indebtednesses. This right was apparently desired so that Bankers could foreclose all possible and contingent interests in such collateral held by United Equity and the guarantors of its indebtedness. Bankers also obtained the right to put such collateral back to petitioner and receive back from him the Royal American shares if Bankers should be unsuccessful in realizing on the surplus deposit agreements. The

Bankers-Crown agreement was to be governed by, interpreted, and construed in accordance with Illinois law.

(e) Petitioner with Hoy (hereinafter the Hoy-Crown agreement), pursuant to which Hoy conditionally agreed to indemnify petitioner against loss by reason of petitioner's return of the Royal American stock to Bankers under the Bankers-Crown agreement.

(f) Petitioner with General Dynamics, pursuant to which if Bankers returned the collateral to petitioner under the Bankers-Crown agreement, General Dynamics would have a 10-day option to acquire such collateral for the value of the Royal American stock petitioner would have to return to Bankers.

Following execution of the various agreements of January 8, 1968, Bankers proceeded to foreclose on the various items of collateral covered in those agreements. By letter dated May 8, 1968, counsel for Bankers advised petitioner that Bankers considered that it had complied with the foreclosure provisions of section 9–505 of the Uniform Commercial Code and had acquired title to the collateral.

On June 20, 1969, Bankers exercised its right under the Bankers-Crown agreement to put the collateral back to petitioner and required petitioner to return the Royal American stock. The collateral put back to petitioner included ICL stock, stock of two ICL subsidiaries, and an ICL surplus deposit agreement in the principal amount of $500,000.

By instrument dated December 29, 1969, petitioner assigned to Jerome Castle (hereinafter Castle), the items previously put back to Crown by Bankers on June 20, 1969, as well as petitioner's rights under the Hoy-Crown agreement. The stated consideration for the assignment was $2,500. Castle was then president of Penn-Dixie Cement Corp. (now Penn Dixie Corp.) of which Hoy was then executive vice president.

After the Commissioner of Insurance for the State of Connecticut commenced proceedings against ICL in November 1965, ICL ceased the active conduct of business and, on April 1, 1966, ICL reinsured all of its policies in force with an unrelated party. In January 1970, the Insurance Commissioner commenced proceedings seeking the dissolution of ICL, which was effected September 5, 1975.

Hoy was president of Material Service Division of General Dynamics at an annual salary of $75,000 until late 1968 or

early 1969. He then became executive vice president and vice chairman of Penn-Dixie Cement Corp., with an annual salary of $65,000. Hoy was criminally prosecuted for allegedly misrepresenting his financial worth in loan applications by himself and his associates between 1962 and 1966. He pleaded guilty to 1 of 16 counts, and received a 2-year prison sentence which he began serving in November 1971. Hoy died on August 21, 1973.

Petitioners claimed a nonbusiness bad debt deduction in the amount of $2,697,131.31 on their joint Federal income tax return for 1966. Respondent disallowed the deduction. In the petition herein, petitioners claim entitlement to either the nonbusiness bad debt deduction of $2,697,131.31 for 1966 (with the recoveries of $70,000 in 1968 from petitioner's coguarantors and $2,500 in 1969 on the assignment of the collateral to Castle being treated as short-term capital gains) or, alternatively, either a nonbusiness bad debt deduction for the calendar year 1969 in the amount of $2,624,631.31 ($2,697,131.31 less $70,000 and $2,500) or a $2,624,631.31 long-term capital loss from the sale on December 29, 1969, of petitioner's entire interest in the United Equity collateral and the Hoy-Crown agreement.

## OPINION

This case concerns the effect, for income tax purposes, of events arising from petitioner's guaranty in 1963 of an indebtedness owed by United Equity to American National. The salient facts follow.

At American National's request, petitioner satisfied his obligation as guarantor of the United Equity indebtedness by substituting his personal note payable to American National in the amount of $2,697,131.31 for the note of United Equity. Petitioner received from American National the collateral it held securing the United Equity indebtedness. In December of 1966, petitioner borrowed $2,697,131.31 from First National and used the funds to pay his note at American National. In March of 1967, petitioner borrowed $3 million from American National. He used these funds to repay the December 1966 loan from First National and to reduce the balances of other loans outstanding from that institution.

During 1968, petitioner, Bankers, American Fletcher, General Dynamics, and Hoy entered interrelated agreements, the ultimate effect of which, as far as pertinent to this case, was that Bankers obtained the United Equity collateral held by petitioner as well as several ICL surplus deposit agreements, petitioner received from Bankers shares in Royal American, and Hoy indemnified petitioner against any loss resulting from the Bankers-Crown agreement. By May of 1968, Bankers had foreclosed on the United Equity collateral. In June of 1969, Bankers exercised its right under the Bankers-Crown agreement to put back to petitioner the United Equity collateral and one ICL surplus deposit agreement and to require petitioner to return the Royal American stock. On December 29, 1969, petitioner assigned to Castle for $2,500 the United Equity collateral, the ICL surplus deposit agreement, and his rights to indemnification under the Hoy-Crown agreement.

Petitioner's principal contention is that he is entitled to a bad debt deduction under section 166[1] for 1966 because in that year he paid his obligation to American National as guarantor of the United Equity indebtedness and there was no reasonable expectation of recovery from the primary debtor, coguarantors, or the collateral securing the indebtedness. Alternatively, petitioner contends that he is entitled to a bad debt deduction for 1969 or to a deduction for a capital loss realized on the 1969 sale of his entire interest in the United Equity collateral and the indemnification rights he had obtained under the Hoy-Crown agreement.

Respondent, on the other hand, argues that petitioner has made no "payment" sufficient to support a bad debt deduction in 1966 or 1969 or any intermediate year. Additionally, respondent argues that petitioner's basis in the collateral assigned in 1969 was zero or a nominal amount not in excess of the transfer price, so that petitioner is not entitled to a capital loss in 1969.

It is well established that no deduction for a bad debt or a loss is available to a cash method taxpayer unless the taxpayer has made an outlay of cash or of property having a cash value.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue.

*Helvering v. Price*, 309 U.S. 409 (1940); *Eckert v. Burnet*, 283 U.S. 140 (1931). Also well established is the principle that the substitution of a guarantor's personal note for that of the primary obligor, in satisfaction of the guarantor's guaranty, does not constitute such an outlay until the note is actually paid. *Eckert v. Burnet, supra*; *Perry v. Commissioner*, 49 T.C. 508 (1968).

However, payment may be effected with borrowed funds giving rise to a deduction to a cash basis taxpayer, for the case law holds that "payment" of an otherwise deductible item with borrowed funds will be respected for tax purposes unless the lender retains control over the loan proceeds. *Heyman v. Commissioner*, 70 T.C. 482 (1978), affd. without published opinion 633 F.2d 215 (6th Cir. 1980); *Wilkerson v. Commissioner*, 70 T.C. 240 (1978); *Rubnitz v. Commissioner*, 67 T.C. 621 (1977); *Watson v. Commissioner*, 8 T.C. 569 (1947); *Ferris v. Commissioner*, 38 B.T.A. 312 (1938), affd. per curiam 102 F.2d 985 (2d Cir. 1939).

We recently had occasion to carefully review the case law on this specific subject. *Franklin v. Commissioner*, 77 T.C. 173 (1981). That case concerned a taxpayer who borrowed money from a lender to pay interest due that same lender, and we emphasized that a deduction is allowed when the taxpayer exercises unrestricted control over the borrowed funds but denied when the lender retains control of the funds. We concluded our review of the particular area of tax law here under consideration with the following comment:

> The foregoing concepts result in a discontinuity in the law. Wherever the courts seek to draw an understandable line between these concepts, at some point we find that the line separates cases that have little economic difference between them. Nevertheless, the task falls to us to draw the line and we proceed on the basis that the taxpayer will ordinarily be bound by the tax consequences of the *form he has chosen. Don E. Williams Co. v. Commissioner*, 429 U.S. at 579–580; *Yamamoto v. Commissioner*, 73 T.C. 946, 954 (1980), on appeal (CA9, Sept. 12, 1980); *Heyman v. Commissioner*, 70 T.C. at 487. [*Franklin v. Commissioner, supra* at 184. Emphasis added.]

It is clear that petitioner's collateralized note to American National, while incontestably the equivalent of cash, did not effect payment. But here petitioner borrowed the funds from First National at the end of 1966 and paid off the note at American National. That would seem to be the end of the case, but respondent argues that the First National loan and the

payment in December of 1966, and the new loan from American National of March 1, 1967, are parts of a single, integrated planned transaction which began and ended with petitioner still indebted to American National for the full amount of the United Equity debt guaranteed by him. Respondent alleges that petitioner did not intend to and did not in fact pay off his indebtedness to American National, but merely effected a temporary relocation of that indebtedness to create the appearance of payment.

In the right context, this essentially substance-over-form argument would be very persuasive. But this is not the right context, for as the above discussion from *Franklin* demonstrates, form has been accorded considerable weight in the particular area under discussion in which divergent tax consequences are ascribed to transactions with identical business results. As one treatise puts it:

Deductions are regularly allowed for business expenses paid with borrowed funds, provided the funds are not borrowed from the person to whom payment is made; indeed, the taxpayer *must* take the deduction when the borrowed funds are used to pay the deductible item, rather than when the loan is repaid.

The distinction is encountered most frequently when a taxpayer borrows a specified sum but signs a note for a larger amount, the difference being withheld by the lender as prepaid interest. The interest is not "paid" in these circumstances, even though the same economic result, with a deduction for the interest, could be achieved by borrowing the basic amount from one bank and the additional amount from a second bank and using the latter amount to pay the interest due to the first bank. Thus, a cash-basis taxpayer whose credit is good can get an immediate deduction by borrowing from Peter to pay Paul, but can postpone the deduction by "borrowing" from Paul to pay Paul. The denial of a deduction in the latter case, it should be noted, occurs even if the debt to Paul is evidenced by a negotiable or secured instrument that must be included in Paul's gross income because it is the equivalent of cash when received by a cash-basis taxpayer. [B. Bittker, Federal Taxation of Income Estates and Gifts, par. 105.2.4, pp. 105–42—105–43 (1981). Fn. refs. omitted.]

In the present case, petitioner no longer owed American National after December 30, 1966. He paid off his note, and his collateral was returned, although it was retained in a safe deposit vault in petitioner's name at American National. There is no indication that petitioner's access to these securities was in any way restricted during the early part of 1967, or

that he was committed to leaving the securities at American National until a new loan could be arranged.

As far as American National was concerned, petitioner had paid his debt at the bank on December 30, 1966, and it was under no obligation to advance him any additional funds at a later date—and indeed would have refused to had his financial circumstances changed dramatically in the interim.

More importantly, petitioner borrowed the funds to pay American National from First National, and as to these funds, the taxpayer exercised unrestricted control. American National only came into possession of these funds when they were used by petitioner to liquidate his debt to that institution.

Respondent's position would simply introduce further uncertainty inimical to practical administration without any corresponding increase in equity. We therefore hold that on the particular facts and circumstances here present, petitioner made payment in 1966.[2]

Respondent also argues that petitioner is not entitled to a bad debt or capital loss deduction because he has not made payment of "after-tax capital." While respondent's argument is hardly a model of clarity, his position appears to be that no deduction is available herein because petitioner paid Ameri-

---

[2]Additionally, as to the step transaction doctrine, respondent must show the mutual interdependence of the steps. *American Bantam Car Co. v. Commissioner*, 11 T.C. 397, 405 (1948), affd. per curiam 177 F.2d 513 (3d Cir. 1949), cert. denied 339 U.S. 920 (1950); *Yamamoto v. Commissioner*, 73 T.C. 946, 954 (1980), on appeal (9th Cir., Sept. 12, 1980); 3 J. Mertens, Law of Federal Income Taxation, sec. 20.161 (1972 ed.). With respect to the element of mutual interdependence, the courts have looked at whether the steps are so mutually interdependent that the legal relations created in one step would have been fruitless without the completion of the others. E.g., *Capital Sales, Inc. v. Commissioner*, 71 T.C. 416, 434 (1978); *H. B. Zachry Co. v. Commissioner*, 49 T.C. 73, 82 (1967); *American Bantam Car Co. v. Commissioner, supra* at 405, but see *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 418 F.2d 511 (1969). There is no compelling indication in the record that American National was obligated to loan petitioner, in 1967, the same amount petitioner had paid to it in 1966, nor any evidence that the steps were inseparably related. The suspicion that there may have been a prearranged plan is insufficient. E.g., *Estate of Glass v. Commissioner*, 55 T.C. 543, 571–573 (1970), affd. per curiam 453 F.2d 1375 (5th Cir. 1972). When petitioner borrowed approximately $2,700,000 from First National in 1966 on a 60-day note, he and the Crown family enterprises had available at that institution $42 million of a $50 million informal line of credit. We are given no reason to believe that the 1966 loan from First National was dependent upon any subsequent borrowing from American National. Certainly these transactions had separate legal significance; and based on the record before us, we are unable to say that petitioner's 1966 borrowing from First National to pay American National would have been fruitless without the 1967 borrowing from American National.

can National with borrowed funds; thus petitioner has no basis in the bad debt upon which to premise a deduction, and additionally, there has been no "payment." Respondent notes that at the time of the trial herein, petitioner had not paid the March 1, 1967, American National loan in full, and contends that until petitioner finally "closes the transaction by actual dollar-for-dollar payment he has not yet realized * * * a loss."

Respondent relies on *O'Meara v. Commissioner*, 8 T.C. 622 (1947), and *Rains v. Commissioner*, 38 B.T.A. 1189 (1938), as support for his espoused rule that payment of after-tax capital is a condition precedent to establishing a basis in property for purposes of the allowance of a loss or bad debt deduction to a cash basis guarantor. By this reliance, respondent has broadened considerably the scope of these cases, and has ignored the implications of *Crane v. Commissioner*, 331 U.S. 1 (1947).

*O'Meara* and *Rains* involve deductions arising from items that were, or should have been, included in the taxpayers' incomes. In *O'Meara*, a cash basis taxpayer who was required by an adverse court decree to make restitution of oil royalties which he had previously reported in income, was allowed a loss deduction for the year of repayment. The Government had argued that the taxpayer was not entitled to a deduction in the year of repayment because the earlier inclusion in income had not generated any tax liability, due to a net loss for the year.[3] The Court stated the following relevant principles of law:

> Before deductions for losses, bad debts, and the like can be availed of by taxpayers, a basis for the property involved must be established. Where such items represent not capital, but income, no deduction is permissible which deals merely with anticipated profits. A taxpayer may not take a loss in connection with an income item unless it has been previously taken up as income in the appropriate tax return. A short form for stating the rule might thus be that the process of establishing a *basis for an income item* consists, in effect, of reporting it in the taxpayer's gross income for tax purposes. [8 T.C. at 632–633. Citations omitted; emphasis added.]

*Rains* illustrates an indirect attempt by the taxpayer, through the mechanism of basis in property, to deduct "the loss of a gain which has not been reflected in income." 38 B.T.A. at 1196. In that case, the Court determined that the

---

[3]*O'Meara v. Commissioner*, 8 T.C. 622 (1947), preceded the enactment of sec. 1341, I.R.C. 1954, 68A Stat. 348.

basis of property received by the taxpayer in exchange for accrued but unreceived and unreported royalties excluded such royalties.

The instant situation, unlike *O'Meara* and *Rains*, does not involve a deduction for either a "loss in connection with an income item" or "the loss of a gain which has not been reflected in income." Rather, we are concerned herein with a deduction for an advance from capital for an item which, if collected, would not have been includable in petitioner's gross income.

A taxpayer may claim a bad debt deduction for debts "created by advances out of capital or out of income previously taxed or exempted or, in other words, debts with regard to which the taxpayer has a basis." *Swenson v. Commissioner*, 43 T.C. 897, 898 (1965). See sec. 166(b), I.R.C. 1954. Once petitioner paid off his 1966 note to American National he acquired a basis in the United Equity debt. The fact that such payment was effected with funds borrowed in a distinct and separate loan transaction with a third party in no way alters this conclusion. See *Crane v. Commissioner, supra*; *Edwards v. Commissioner*, 19 T.C. 275 (1952).

Having determined that petitioner did, in fact, make a "payment" in 1966, we must determine whether it occasioned petitioner's entitlement to a bad debt deduction for 1966 or for any of the other years in issue.

When petitioner paid the United Equity debt as guarantor, he obtained a claim against the corporation. If petitioner was subsequently unable to recover from the corporation on the claim, he sustained a loss from the worthlessness of a debt deductible only under section 166.[4] *Putnam v. Commissioner*,

---

[4]During the years in issue, sec. 166 provided in pertinent part as follows:

SEC. 166. BAD DEBTS.

  (a) GENERAL RULE.—

    (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

    (2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

  (b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

  (c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable

352 U.S. 82, 85 (1956). The deduction is allowed not because of the payment as guarantor but because the payment gives rise to a claim which if worthless constitutes a bad debt. *Estate of Pachella v. Commissioner*, 37 T.C. 347, 354 (1961), affd. per curiam 310 F.2d 815 (3d Cir. 1962); see *Santa Anita Consolidated, Inc. v. Commissioner*, 50 T.C. 536, 559 (1968).

Section 166(d)(1)(B) permits a nonbusiness bad debt[5] to be treated as a loss from the sale or exchange of a capital asset held for not more than 6 months[6] if the nonbusiness bad debt becomes entirely worthless within a taxable year. Thus, we must determine whether the United Equity debt owed to petitioner became entirely worthless within any of the taxable years 1966 through 1969.

Petitioner has the burden of proving that the debt became worthless in 1966 or in one of the later years in issue. Rule 142, Tax Court Rules of Practice and Procedure; *Cimarron Trust Estate v. Commissioner*, 59 T.C. 195, 199 (1972). There is no standard test or formula for determining worthlessness within a given taxable year; the determination must depend upon the particular facts and circumstances of the case. *Dallmeyer v. Commissioner*, 14 T.C. 1282, 1291 (1950). However, it is generally accepted that the year of worthlessness is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope of recovery. *Estate of Pachella v. Commissioner, supra* at 353; *Feinstein v. Commissioner*, 24 T.C. 656, 658 (1955).

---

addition to a reserve for bad debts.

   (d) NONBUSINESS DEBTS.—

      (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—

        (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

        (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

      (2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

        (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

        (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

[5] There is no contention that the United Equity debt was other than a nonbusiness debt as defined by sec. 166(d)(2).

[6] Sec. 166(d)(1)(B) was amended by sec. 1402(b), Tax Reform Act of 1976, 90 Stat. 1520, 1731, to substitute "9 months" for "6 months," effective for taxable years beginning in 1977, and "1 year" for "9 months," effective for taxable years beginning after Dec. 31, 1977.

On November 18, 1965, the Commissioner of Insurance of the State of Connecticut commenced legal proceedings against ICL which eventually resulted in ICL's ceasing to conduct further business. The next day, petitioner satisfied his guaranty of the United Equity indebtedness to American National by substituting himself as primary debtor and he succeeded to American National's position as creditor of United Equity and as holder of the collateral securing the United Equity debt.

Petitioner initially alleges that, in 1966, there was no reasonable expectation of recovery from the primary debtor, coguarantors, or the collateral securing the primary indebtedness. Petitioner's ability to recover from the primary debtor or the collateral securing the primary indebtedness was inextricably related to the financial soundness of ICL, the stock of which constituted United Equity's principal asset and served as collateral securing the United Equity indebtedness. Although ICL ceased doing business in 1965, it had substantial insurance in force when the State court proceedings were commenced.

Moreover, ICL had actually or potentially valuable assets or interests throughout the years in issue. In 1966, ICL entered into a reinsurance agreement with Valley Forge Life Insurance Co. under which there was the possibility of substantial profit to ICL through 1980. The evidence presented indicates that not until mid-1969 was it acknowledged that ICL would not realize any significant profit under the reinsurance agreement. In view of ICL's possession of these potentially valuable assets, the fact that United Equity was adjudicated a bankrupt in 1967 does not require a finding that petitioner's claim against United Equity was worthless in 1967. See *Dallmeyer v. Commissioner, supra,* and cases cited therein, 14 T.C. at 1292.

Furthermore, the record does not support petitioner's allegation that in 1966 there was no reasonable expectation of recovery from his coguarantors of the United Equity indebtedness. Petitioner had obtained indemnity agreements from five of his six coguarantors in 1963. In 1968, petitioner collected $70,000 from three of these individuals in full settlement of their respective liabilities. The record is devoid of any evidence establishing that prior to 1968, these coguarantors were unable to fulfill their obligations to petitioner or,

indeed, that petitioner attempted to collect the amounts owed to him under the indemnity agreements.

Finally, the complex series of cross-agreements involving Bankers, American Fletcher, General Dynamics, Hoy, and petitioner in 1968 belies petitioner's argument that the United Equity debt was worthless prior to 1969. The transactions centered around an attempt by Bankers to realize on certain ICL surplus deposit agreements. These surplus deposit agreements were not part of the United Equity collateral. However, they appear to have been integrally related to the value of ICL and, therefore, the ICL stock, and the parties apparently still believed in 1968 that a substantial amount could be salvaged from the collective collateral securing the indebtednesses of United Equity and Hoy and Holliday.

Although most of these events occurred after 1966, it is not uncommon to take cognizance of subsequent events in confirming whether a debt becomes worthless in a particular year. See, e.g., *Trinco Industries, Inc. v. Commissioner,* 22 T.C. 959, 965 (1954). Consequently, we cannot find that the debt owed to petitioner by United Equity was worthless prior to 1969. In that year, it appears that the parties properly acknowledged that further efforts to recover on the United Equity indebtedness through the ICL stock and surplus deposit agreements would be futile. We view the 1969 reversal of the Bankers-Crown agreement as a sufficiently "identifiable event" to warrant treating the United Equity debt as worthless in 1969. Therefore, petitioner is entitled to the deduction in 1969 (less of course the amounts he recovered from his coguarantors or realized on the collateral).[7]

*Decision will be entered under Rule 155.*

---

[7]Since petitioner is not entitled to a bad debt deduction for 1968 or any prior year, it follows that the $70,000 received in 1968 from the coguarantors and indemnitors is not taxable income in 1968, for there was no prior deduction as to which this repayment would constitute a recovery. Rather, the $70,000 operates to reduce the amount of deduction allowable in 1969, the year to which the bad debt deduction is properly attributable.