ESTATE OF HERBERT M. RAPOPORT, DECEASED, KATHRYN RAPOPORT, SPECIAL ADMINISTRATOR, and KATHRYN RAPOPORT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Rapoport v. Commissioner
Docket No. 2754-79.
United States Tax Court
T.C. Memo 1982-584; 1982 Tax Ct. Memo LEXIS 164; 44 T.C.M. (CCH) 1330; T.C.M. (RIA) 82584; October 4, 1982. R. David Garber, for the petitioners. *166 J. Anthony Hoefer, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the years 1974 and 1975 in the amounts of $2,371.43 and $4,375.51, respectively. The issues for decision are whether there was a bad debt and, if so, whether it was a business or nonbusiness bad debt. FINDINGS OF FACT The facts of this case have been fully stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed in this case, Herbert and Kathryn Rapoport were husband and wife, residing in Omaha, Nebraska. Generally, the Rapoports will be called "petitioners," but where individual reference is necessary, they will be referred to as Herbert and Kathryn. After the filing of the petition in this case, Herbert died. Kathryn was appointed special administrator for Herbert's estate, and, in that capacity, was substituted for Herbert as petitioner. Petitiones filed their joint Federal income tax returns for the taxable years 1974 and 1975 with the Internal Revenue Service *167 Center, Ogden, Utah. Petitioners prepared their returns using the cash receipts and disbursements method. The Carriage Shop, Inc. (the Omaha store) was incorporated in 1966 as a Nebraska corporation, and petitioners owned all of its outstanding stock. Their original cost basis in the Omaha store stock was $10,000. By the tax years in question, the records of the Omaha store showed the stated capital as $45,000. The Carriage Shop of Lincoln, Inc. (the Lincoln store) was incorporated in 1968 as a Nebraska corporation, and petitioners owned all of its outstanding stock. Upon incorporation of the Lincoln store, petitioners filed a section 1244 [1] election with respect to their stock in the Lincoln store. Petitioners paid $10,000 for their section 1244 stock in the Lincoln store. [2]Both corporations used fiscal tax and accounting years beginning February 1 and ending January 31 of the following year. *168 The Omaha store and the Lincoln store were engaged in selling similar lines of ladies' clothing and accessories at retail. Inventory for both stores was purchased in the name of the Omaha store. The Lincoln store was supplied with merchandise through transfers of inventory from the Omaha store. Costs of the transferred merchandise were entered on the Lincoln store's books as accounts payable to the Omaha store and on the Omaha store's books as accounts receivable from the Lincoln store. The Lincoln store ceased operations sometime on or before January 31, 1973. At that time, a large amount of money remained due and owing to the Omaha store from the Lincoln store for merchandise previously shipped to the Lincoln store. The Lincoln store transferred its remaining inventory back to the Omaha store to reduce the debt. After this transfer of inventory, the Lincoln store's remaining assets were insufficient to pay both the remaining account payable to the Omaha store and the corportion's other creditors. On January 31, 1973, Herbert purported to assume the obligation to pay $52,829.42 of the Lincoln store's debt to the Omaha store. [3] In closing both stores' books for the period *169 ended January 31, 1973, adjusting journal entries were made to reflect such an assumption of debt. On the Lincoln store's books, a credit was made to Herbert's account and a debit was made to the account payable to the Omaha store. On the Omaha store's books, a debit was made to Herbert's account and a credit was made to the account receivable from the Lincoln store. Herbert's purported assumption of $52,829.42 left the Lincoln store with sufficient assets to pay all creditors, including the Omaha store, other than Herbert. *170 On February 1, 1974, the Omaha store's ledger sheet for accounts receivable from Herbert (to the Omaha store) showed a balance forwarded of $48,649.70. [4] That leader sheet also reflected that during 1974, payments were made on the accounts receivable to the Omaha store, reducing the balance in the account, and that periodic payments of money were made to Herbert from the Omaha store, increasing the balance in his account. [5] As of February 28, 1975, that ledger sheet showed his balance due to the Omaha store as $41,566.90, reflecting a net decrease during this one-year period of $7,082.80. This ledger sheet seems to treat Herbert's wages from the corporation as a payment on his account. The record does not establish that Herbert made any actual cash payments on the alleged indebtedness during the year 1974. *171 Over a period of years, the Omaha store borrowed funds from the First West Side Bank, Omaha, Nebraska (West Side or the bank). On December 7, 1967, petitioners executed a guarantee in favor of West Side covering all debts or obligations of the Omaha store to the bank. The guarantee stated that it was to be continuous until revoked in writing and was to be in consideration of credit given and to be given by the bank to the Omaha store. On January 31, 1972, the Omaha store owed the bank $78,220.91. By July 31, 1972, that debt had been reduced to $49,246. A payment of $3,394.38 was made on July 13 and a payment of $23,684.24 was made on July 24. [6] As of January 31, 1973, the date on which Herbert purported to assume the Lincoln store's debt to the Omaha store, the balance due to the bank from the Omaha store was $44,246.22. The record does not establish that West Side ever loaned any money to the Lincoln store or that petitioners ever executed a guarantee in regard to the Lincoln store. See Footnote 6. *172 On May 30, 1974, petitioners adopted a resolution directing that the Lincoln store be dissolved within 12 months (a section 337 plan of complete liquidation). Herbert executed a Form 966, Corporate Dissolution or Liquidation, which the Internal Revenue Service Center, Ogden, Utah, received on June 17, 1974. Petitioners received no salary or other income from the Lincoln store during the years in question. Petitioners received the following salary from the Omaha store: Income--
Income--
Year
Herbert Rapoport
Kathryn Rapoport
1971
$6,480.00
1972
6,480.00
1973
6,480.00
1974
$20,000.00
6,920.00
1975
20,000.00
7,260.00
During the years in question, the Lincoln store showed deficit earned surplus (retained earnings). The Omaha store reported earned surplus in the following amounts: January 31, 1972
$15,098.32
January 31, 1973
20,437.64
January 31, 1974
29,731.50
January 31, 1975
31,501.26
On their 1974 income tax return, petitioners reported an ordinary loss of $62,829.42 under section 1244 for their worthless stock in the dissolved Lincoln store. Consequently, their 1974 return showed a net loss of $35,883.70, *173 and no tax due. On their 1975 income tax return, petitioners reported a net operating loss carryforward in the amount of $19,101.17, representing the balance of their claimed section 1244 loss for 1974. [7] In his notice of deficiency, respondent allowed $10,000 of petitioners' claimed section 1244 loss for 1974, which was their basis in their section 1244 stock. Respondent disallowed the balance of $52,829.42 as either a section 1244 loss or as a business bad debt under section 166, and consequently disallowed any carryover of any portion of that amount to 1975. [8]
OPINION Herbert purported to assume the Lincoln store's obligation on its account payable to the Omaha store, to the extent of $52,829.42. Petitioners argue: (1) that through this assumption, the Lincoln store became obligated to *174 pay Herbert the $52,829.42 which he undertook to pay the Omaha store; (2) that this obligation became worthless in 1974; and (3) that Herbert's dominant motivation in assuming this obligation was to protect his status and Kathryn's status as employees of the Omaha store. Respondent contends that there was no "debt" within the meaning of section 166. Alternatively, respondent argues that even if such a bona fide debt were involved, it was incurred to protect petitioners' investment rather than their status as employees, and was therefore deductible only as a short-term capital loss. See Sec. 166(d). We agree with respondent's first argument that no bona fide debt is here involved and therefore we need not reach his alternative argument. [9]
*175 Section 166[10] generally allows a deduction for "any debt which becomes worthless within the taxble year." Sec. 166(a)(1). If non-corporate taxpayers, such as petitioners here, are involved, only business debts are deductible against ordinary income; non-business debts are treated as short-term capital losses. Sec. 166(d)(1)(B). There is a threshhold requirement that there be a "bona fide" debt, defined in the pertinent regulations as follows: *176 A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. * * * Sec. 1.166-1(c), Income Tax Regs. No deduction is allowable if at the time of acquiring the debt the taxpayer had no reasonable expectation of repayment of the sums advanced. Arrigoni v. Commissioner,73 T.C. 792, 799 (1980); Thompson v. Commissioner,22 T.C. 507, 517 (1954); Hoyt v. Commissioner,145 F. 2d 634 (2d Cir. 1944).[11] An exception to the general rule arises where a guarantor of a debt is compelled to pay on his guarantee, and then the worthlessness of the debt upon acquisition does not necessarily preclude a bad debt deduction. Putnam v. Commissioner,352 U.S. 82, 85 (1956). That is because upon payment by the guarantor, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, *177 and by subrogation the guarantor steps into the shoes of the creditor. As this Court explained the rule in Crown v. Commissioner,77 T.C. 582, 598 (1981): The deduction is allowed not because of the payment as guarantor but because the payment gives rise to a claim which if worthless constitutes a bad debt. Estate of Pachella v. Commissioner,37 T.C. 347, 354 (1961), affd. per curiam 310 F. 2d 815 (3d Cir. 1962); see Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 559 (1968). In such a case, the time for determining whether the taxpayer had a reasonable expectation of repayment is the time the guarantee was given, rather than the time the taxpayer acquires, by subrogation or otherwise, [12] the debt that he has been compelled to pay. Arrigoni v. Commissioner,supra;Markle v. Commissioner,17 T.C. 1593, 1598 (1952); *178 Hoyt v. Commissioner,supra.
Petitioners do not dispute the general rule stated above, that a debt, worthless when acquired, is not a bona fide debt for purposes of section 166. Instead they argue that the general rule does not apply to them. The basis for their argument seems to be the guarantor exception. Petitioners seem to argue that the assumption was made on account of their personal guarantee of the Omaha store's debt to West Side, that it was made under financial coercion by the creditors of the Omaha store, most notably the bank and the Small Business Administration (SBA), and that the assumption *179 was necessary to prevent the bankruptcy of the Omaha store. Petitioners' arguments are wholly unsupported by the record. [13] Nothing in the record indicates that the Lincoln store's account payable to the Omaha store in any way resulted in petitioners' personal liability on their guarantee of the Omaha store's debt to the bank. Nothing in the record in any way shows that Herbert's purported assumption was necessary for the financial survival of the Omaha store, much less for the preservation of petitioners' employment at the Omaha store. Other than allegations in the petition which were denied in respondent's answer, the record is devoid of any reference to the SBA. That petitioners guaranteed the Omaha store's obligation to the bank and that the Omaha store was used as purchasing agent for the Lincoln store in no way justify the conclusion that somehow the Lincoln store was directly liable to the bank, or that petitioners' guarantee for the Omaha store extended to any such liability of the Lincoln store. *180 Petitioners seem to suggest that we should disregard the separate corporate entities of the Lincoln and the Omaha stores because their creditors allegedly treated them as a single economic unit. We decline their invitation to do so. There are no facts of record as to how West Side or any other creditors treated either corporation. The record discloses no basis for treating the Lincoln and the Omaha stores as a single corporation. Furthermore, we note that to so treat the separate corporations would be of no avail to petitioners. Even if Herbert had assumed the account payable because of a guarantee of the corporate group's debt to the bank, any debt acquired by payments on such a guarantee would not be worthless. The Omaha store was still in existence and still earning money during the taxable years in question, and thus, from the record, fully able to pay any debt to Herbert. The only transaction here involved that could conceivably permit a bad debt deduction under section 166 is the Lincoln store's purported debt to Herbert, created on its books on January 31, 1973, in exchange for Herbert's purported assumption of the Lincoln store's account payable to the Omaha store. *181 Analyzing that transaction, we find no bona fide debt. In exchange for his purported assumption of the Lincoln store's debt to the Omaha store, Herbert purportedly received the Lincoln store's "promise" to pay him the amount of $52,829.42 (reflected by an entry in its ledger to an account payable). On January 31, 1973, when the adjusting entries were made in the books to reflect this purported assumption, the Lincoln store was hopelessly insolvent. It had ceased active business operations and existed as a mere corporate shell. From the stipulated facts, it is clear there was no way that the Lincoln store could eer have repaid Herbert. Consequently, any debt which Herbert obtained from the Lincoln store was worthless at its inception, and he entertained no reasonable expectation of repayment. Since no bona fide debt is involved here, petitioners are not entitled to a bad debt deduction under section 166. Moreover, it is well established that no deduction for a bad debt is available to a cash basis taxpayer such as Herbert unless he has made an outlay of cash or property having a cash *182 value. Helvering v. Price,309 U.S. 409 (1940); Eckert v. Burnet,283 U.S. 140 (1931); Crown v. Commissioner,77 T.C. at 592-593. Herbert never advanced or loaned any money or property to the Lincoln store in connection with the alleged indebtedness of $52,829.42. Any "payments" that were made were made to the Omaha store. And we are not persuaded that the book entries reflecting "payments" of some $8,000 to the Omaha store during the calendar year 1974 represented any actual cash outlays by petitioners. Since we hold that there was no bona fide debt in this case, we need not decide whether such "debt" was business or nonbusiness. We note that under the objective test of United States v. Generes,405 U.S. 93 (1972), any such debt would almost certainly have been a nonbusiness debt. In addition to their initial investment of $10,000, any shareholder "loan" would have been treated as part of petitioners' capital investment in the Lincoln store. Since petitioners received no income from the Lincoln store for the years in question, the conclusion that the "loan" was merely to protect their investment would *183 appear to be inescapable. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years involved, unless otherwise noted. ↩
2. As of January 31, 1973, the records of the Lincoln store showed the stated capital at the initial $10,000 figure.↩
3. The facts of this case were fully stipulated, but that does not alter the burden of proof which still rests with petitioners. Service Bolt & Nut Co. Trust v. Commissioner,78 T.C. 812, 819 (1982); Estate of Luehrmann v. Commissioner,33 T.C. 277, 281 (1959), affd. 287 F. 2d 10, 16 (8th Cir. 1961); Stevens v. Commissioner,T.C. Memo. 1980-521↩. Paragraph 9 of the parties' stipulation states that on January 31, 1973, certain adjusting journal entries were made "to reflect an assumption by Herbert Rapoport of the Lincoln store's debt to the Omaha store." On brief petitioners argue that this use of the word "assumption" was a mistake and that petitioners "at no time assumed any corporate debt." Petitioners' attempt on brief to vary the terms of the stipulation and their reliance upon facts outside the record in support of such an attempt are improper. The Court notes that in their petition to this Court petitioners alleged "Upon liquidation, the account payable owed by the Lincoln store to the Omaha store in the amount of $52,829.42 was assumed by the Petitioners." We need not decide whether petitioner Herbert Rapoport "assumed" the debt of the Lincoln store to the Omaha store, since we are satisfied that any such debt was already worthless before he purpoted to assume it. The record does not establish that there was any bona fide debt between Herbert and either the Lincoln store or the Omaha store in regard to the $52,829.42.
4. The balance on the Omaha store's ledger sheet for Herbert's account as of February 1, 1974, was shown initially as $52,829.42, the exact amount of the purported assumption one year earlier. This figure was scratched out and changed to $48,649.70. The record divulges no reason for this cange, but this lower figure was also shown on the unaudited financial statement for the Omaha store for the year ended January 31, 1974. ↩
5. The record is silent regarding any payments to or draws by Herbert between January 31, 1973, the date when he purported to assume the Lincoln store's debt due the Omaha store, and February 1, 1974.↩
6. Petitioners argue on brief that those payments represent the sale of collateral held by the bank under their guarantee, but there are no facts in the record to support their assertion. In any event, assuming petitioners are correct about those payments, that has nothing to do with the alleed indebtedness involved in this case. Petitioners personally guaranteed the obligations of the Omaha store to the First West Side Bank. However, there is nothing in the record to suggest that that bank ever loaned money to the Lincoln store, a corporation that was not even in existence when the guarantee was entered into in 1967. The record does not indicate that petitioners' guarantee agreement was ever extended to the Lincoln store. Petitioners' arguments on brief are wholly devoid of factual support in the record.↩
7. Petitioners had carried back $17,782.53 of the claimed 1974 loss to the three previous years, leaving a balance of $19,101.17 to be carried over to 1975. See Sec. 1244(d)(3); Sec. 172. The earlier years are not before the Court. ↩
8. There was also an automatic adjustment to petitioners' 1975 medical expense deduction as a result of the increase in their adjusted gross income.↩
9. Petitioners originally claimed a section 1244 loss of $62,829.42, comprised of the $52,829.42 assumption and their $10,000 original cost basis. Respondent allowed the section 1244 ordinary loss only to the extent of their cost basis. Petitioners apparently have conceded the correctness of that determination. See Sec. 1244(d)(1)(B); Sec. 1.1244(d)-2, Income Tax Regs.↩
10. Section 166, as in effect in 1974 and 1975, provided in pertinent part: SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worth-lessness of which is incurred in the taxpayer's trade or business. Sec. 166(d)(1)(B)↩ was amended by sec. 1402(b), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1731, to substitute "9 months" for "6 months," effective for taxable years beginning in 1977, and "1 year" for "9 months," effective for taxable years beginning after December 31, 1977.
11. See also Dunmire v. Commissioner,T.C. Memo. 1981-372; Baker v. Commissioner,T.C. Memo. 1981-137; Harris v. Commissioner,T.C. Memo. 1973-150↩, affd. in an unpublished opinion (5th Cir. Oct. 16, 1974).
12. A similar result is reached where payments giving rise to the debt were not required under a guarantee but were involuntary in the sense that they were necessary in the exercise of sound business judgment to protect existing property rights. Arrigoni v. Commissioner,73 T.C. 792, 799-800 (1980); Martin v. Commissioner,38 T.C. 188↩ (1962). Petitioners seem to argue that such a case of business necessity existed here. The facts of record do not support such an argument, and we will not consider the matter further.
13. In their brief, petitioners sought to "supplement" the stipulated facts. This Court may not consider as evidence factual allegations made in the briefs of counsel. Rule 143(b), Tax Court Rules of Practice and Procedure. Such allegations are not a part of the record, and thus do not satisfy petitioners' burden of proof under Rule 142(a), Tax Court Rules of Practice and Procedure.Evans v. Commissioner,48 T.C. 704 (1967), affd. per curiam 413 F. 2d 1047 (9th Cir. 1969); Jacobs v. Commissioner,T.C. Memo. 1977-1↩.